*PEACOCK CONSTRUCTION COMPANY v.*
*HARTFORD CASUALITY & HARTFORD LLOYD'S INSURANCE COMPANIES*

**EXPERT REPORT**
**MICHAEL SEAN QUINN**

This document is intended to be the Court-required Report of an expert witness in the above-listed case.    This case is pending in the United States District Court for the Southern District of Texas (Brownville Division) and is Civil Action No. B-04-111.   The report is intended to comply with the requirements of Rule 26 of the Federal Rules of Civil Procedure.  If it falls shy or deviates from the requirement of that rule, local rules, or any court order, I shall revise and/or expand it, if given the opportunity to do so by the court and/or the parties.

**I. ABOUT ME**

My name is Michael Sean Quinn.  I am 60-years-old.  I have been a lawyer for the last 24 years, plus several months.  A good deal of my practice has been devoted to liability insurance, although not all of it.    Often my insurance practice has involved commercial lines and construction matters have not been uncommon.

The above case is one in which claims adjustment is critically important, although it is not the only issue.  I have been involved in the adjustment of insurance claims cases for 22 or 23 years.  I have worked with adjusters in adjusting claims.  I have cooperated with them.  I have assisted them.  I have observed them many times at considerable length.  I have given them advice of various kinds, which has often been followed.  I have myself been part of adjustment teams, and I have provided advice and guidance to many adjusters under many circumstances. Thus, I have handled the adjustment of claims, many of which have been commercial claims. From time to time, I have reviewed adjuster performance for more senior officials.  At least as



**EXHIBIT**
*A*

significant, I have recently <u>observed</u> adjusters processing claims over a period of more than two decades.

During that period of time, first as a lawyer for insurance companies, and later in other capacities, I have <u>reviewed</u> literally hundreds upon hundreds of adjustment files, page by page. I have done this frequently while working as an expert witness over the last decade, or so. I have advised insurance companies and others numerous times on whether the acts and omissions of the adjusters they have employed, hired, appointed, and/or utilized—both staff adjusters and independent adjusters—have been acceptable from a legal, industrial, company, customary, and accepted ethical standpoint. This is not something I have spent a little time, here and there, doing. It has been a central part of my occupation for over two decades.

In addition, I have written for publication and/or spoken on insurance adjustment practices a number of times. In order to accomplish this, I have spent an enormous amount of time reading, studying, and reviewing textbooks and treatises on insurance adjustment. (The same applies to the responsibilities, functions, and performances of insurance intermediaries.) Although what I am about to say may sound somewhat arrogant, there is no way I can think of to make the following true point except to say it bluntly. I am probably one of the best read people around, and therefore one of the most learned, on adjustment practices.

This fact can easily be determined from some of my writings. One two-part article was entitled *The Ethical Habitat of Adjusters: Part I. Principles, Problems and Practicalities*, 10 ENVIRONMENTAL CLAIMS JOURNAL 77 (Winter 1998). *Part II* appeared beginning on page 91 of the next issue of the Journal, 10 ENVIRONMENTAL CLAIMS JOURNAL 91 (Winter 1998). This lengthy article (pair of articles) concerned established adjustment practices in considerable detail as well as the law on the ethics of adjustment.

I have also written on discovery as it pertains to adjusters. One of them is *Depositions of Claims People,* 8 COVERAGE 21 (May/June 1998). The journal COVERAGE is a publication of the American Bar Association. An adjuster by the name of John D. Moyer (then an employee of Kemper) and I wrote two essays in 2000 on depositions with respect to adjusters. The first one is entitled *Preparing for Adjuster Depositions in Bad Faith Cases: The Plaintiff's Objections,* 16 BAD FAITH LAW REPORTER 183 (October-November 2000). The second one was entitled as follows: *Preparing for Adjuster Depositions in Bad Faith Cases: Anticipating the Plaintiff's Questions* 16 BAD FAITH LAW REPORTER 231 (December 2000). These two essays have been consolidated and have been used from time to time in other teaching contexts. There are a number of other essays which illustrate my confident claim to be sufficiently knowledgeable to be permitted to testify. Many of the examples set forth in the afore-mentioned essays concern first-party insurance matters.

In addition, I have studied insurance somewhat formally. In fact, I have taken a number of certificates from the best recognized insurance educator in the country. That educational organization is a combination of several historically distinct, but now unified, institutes. They are called the American Institute for Chartered Property Casualty Underwriters, the Insurance Institute of America, and the Insurance Institute for Applied Ethics. I have taken, for example, the "CPCU" designation. That acronym stands for the "Chartered Property and Casualty Underwriting" program. It consists of ten separate courses, and I was awarded the certificate in 2001. Some of the courses pertain to first party insurance. Virtually all of them pertain to adjustment practices. In fact, the CPCU designation entitles one in Texas—and many other states—to an adjuster's license, and I am so licensed. Throughout the insurance industry, the CPCU is recognized as the certificate of authority, a valuable educational program that tends to

identify people as knowledgeable in the industry. Often, people who are in the insurance industry put the acronym CPCU after their name when signing their correspondence. It often appears in conjunction with names in newspapers as a way of indicating that people are knowledgeable about the insurance industry. (Interestingly, the CPCU certificate is counted as a substantial part of the work towards a Master's degree in Insurance Management at Boston University; it is similarly counted toward an MBA by Walden University; and it has some bearing on credits received in graduate studies in insurance at Florida State University.) Many insurance intermediaries engage in these same studies.

In addition to this certificate, I have taken a certificate in the "Associate in Claims" Program from the same institute. I was awarded this certificate in 2001. The courses in this program are precisely devoted to adjustment practices. Partly they are devoted to first party insurance. In addition, from the same institute, I have received additional certifications as follows: "Associate in Underwriting" (2001), "Associate in Surplus Lines Insurance" (2002), "Associate in Fidelity and Surety Bonding" (2002), "Associate in Marine Insurance Management" (2002), and "Associate in Insurance Services" (2003). Some of the latter programs—and not just the CPCU—pertain to first party claims of various sorts. Virtually all of these courses have topics, materials, and themes related to adjustment. Virtually all of them have themes related to underwriting and therefore sales responsibilities. In total, I have taken more than 21 separate courses on insurance from this institute over several years beginning in the late 1990s. My completion of each course has involved reading one or usually more textbooks for each course and passing an objective test on a computer at a testing bureau, each of which can take several hours.

I am currently "taking" another course on Insurance and Financial Planning from a different institute. It too pertains to adjustment, in part. It involves several textbooks, one of which exceeds 500 pages, and there will be a 2-hour exam late in March of 2005. Much of it concerns health and health-related insurance, although by no means all of it. Adjustment practices across different insurance lines can be quite similar.

Some of my knowledge of adjustment results not only from a two decade history of insurance-related work but also from self-education together with teaching and writing. As indicated earlier, I have read textbooks on adjustment practices, treatises on adjustment practice, how-to guidance volumes, and more popular books on adjustment practice in heavy numbers. (Of course, not all of these were from courses, and some of them are historical in nature.) I have also read many articles on the matter. I subscribe, for example, to journals and magazines pertaining to adjustment, at least in part. I read them regularly.

I also have read and continue to read a huge number of court cases pertaining to adjustment. The reading of court cases is particularly valuable because a number of appellate cases, as well as reported trial court cases, describe and discuss adjustment practices in detail and at considerable length. As every law educated person knows, cases are not simply summaries of the law. They are also expositions of facts, statements by witnesses, statements by adjusters themselves, interactions, various evaluations, and so forth.

Finally, I have substantial indirect (self-taught) education on business and adjustment ethics as the result of having acquired a Ph.D. in philosophy, as a result of havingtaught philosophy full-time for several years, and as a result of having taught it part-time on and off for many more years. Some of this teaching involves business, professional, and insurance-oriented

ethics. Adjustment essentially involves applied ethics and/or ethical theory, as all adjuster education and administrative adjustment programs recognize.

All of these forms of education have converged to some degree upon teaching that I have done for law schools over approximately 15 years, some of which has been full-time and some of which has been as an adjunct. I have taught insurance to law students at Southern Methodist University Law School, at The University of Texas School of Law, and at the Law School of the University of Houston. Obviously, it is not possible to teach law students courses on insurance law without discussing the empirical nature of insurance adjusting, the values and principles governing and influencing adjustment, and the applicability of insurance law in adjustment contexts. It is not possible to talk about the law of bad faith without talking about received standards of adjustment and/or the ethics of adjustment. Consequently, I have discussed these matters at considerable length in courses taught at law schools, as well as in other pedagogical forums. I probably never teach insurance to anyone without referencing relevant and fundamental ethical values and principles, including one which is not widely known outside the insurance profession and which is to be analyzed.

I have also done an enormous amount of work in CLE and what I shall call "CIE" ("Continuing Insurance Education"—my linguistic invention) programs. Some of these have been and are sponsored by The University of Texas School of Law. Some have been and are sponsored by the State Bar of Texas. Some have been and are sponsored by South Texas College of Law. Some are sponsored by yet other entities. Sometimes, these courses are also for adjusters, as well as for lawyers. When I was at the law firm of Sheinfeld, Maley & Kay, I lectured several times to insurance adjusters who attended annual meetings at the law firm. Frequently, there were more than a hundred adjusters at these meetings, and I was an invited

speaker. I have been certified by the Department of Insurance over a series of years as someone who can lecture to adjusters and with respect to whom they can receive continuing education "CIE" credit mandated by Texas insurance law and regulation.

Finally, I have written extensively on adjustment of various kinds of claims, including liability claims. The most recent published essay pertained to a type of first-party claim, to wit: disability insurance. It appeared in two parts. I utilized a junior co-author. At least a third of this paper on disability insurance pertained to adjustment practices. That paper has been published in the Insurance Litigation Reporter. Previously it was distributed at a 2004 UT CLE. An early, shorter version was similarly utilized several years ago, although the more recent version was expanded, for example, with respect to adjusting. In January 2005, the paper was also distributed at a CLE program sponsored by the American Bar Association.

Thus, in summary, I have substantial experience in and about various kinds of claims adjustment. I have frequently worked for insurance companies precisely on liability insurance adjustment areas. I have done this for over two decades. I have occasionally worked for policyholders on these matters. I have also testified frequently in the past on these matters. A number of the contexts in which I have testified on insurance related matters are set forth in my resume, a copy of which is attached hereto. The resume itself is 40+ pages long. An accounting of my "Expert Witness Engagements" is to be found in the attached resume. I am almost always found to be relevant and reliable under what are usually *Kumho Tire* type standards. See Ex. A.

To the extent that I am asked to talk about the performance of adjusters, the activities of those adjusting, and how well they work, it is often necessary to talk about how reasonable claims processors interpret insurance policies, how well they understand the law, how they think

- 7 -

about the law which applies to them, and related topics. Such discussion may very well be necessary (or at least relevant and appropriate) in this case if or when I testify.

The facts of this case involve the conduct of insurance intermediaries (brokers, agents, firms of them, etc.) or the like. I have a good deal of knowledge about and experience with respect to understanding and the dealings of such entities and persons. I have taught about them; I have written about them and their cases; I have lectured on them both to lawyers and professional intermediaries; I have testified concerning them and their conduct in cases where they have been significant parties, and so forth. In short, I probably qualify as an expert on matters of insurance brokerage and related topics, although I have testified more frequently about other—though often related—aspects of the insurance business and insurance related activities. (That somewhat, through only to some extent tilted, epistemic relationship may not last for ever. I recently published a lengthy essay on insurance scandals in the Twentieth Century, several of which involved brokers, as it were, "big time." Currently, I am working on an almost equally lengthy essay on the history of Marsh & McLennan. It is scheduled for publication around mid-March 2005. These two current essays will be followed up by three more on the same general topic pertaining to MarshMac's brokerage patterns involving contingency fees. The fifth essay in the sequence will also concern other agencies facing the same history and difficulties, e.g., Aon. The third essay, where one of my associates may be the principal author even though I have done much of the research (although she may now be catching up to me), will concern MarshMac's activities through certain of its subsidiaries, i.e., Putnam, Mercer, and Kroll, which are involved principally (or, at least, to a considerable extent) in non-insurance financial activities, even though they are also involved in insurance-related matters.

Insofar as the general principles of *Daubert* and/or related cases apply to claims processing (adjustment) and to this situation, I qualify under the standards of those cases as someone sufficiently knowledgeable about insurance practices. (As already stated in a related context, a copy of my Resume is attached hereto. It is also incorporated herein, although I must confess that I find typographical errors here and there in the Resume from time to time. At the same time, the errors that I find do not appear to be either contradictory, or horribly inconsistent with significant true propositions, and so forth.)

This section is intended to comply with the relevant requirements of Rule 26(a)(2)(B) insofar as it requires a list of all publications authored by me within the preceding ten years and a list of other cases in which I have testified as an expert witness, either at trial or by deposition or both within the previous four years. (In fact, the lists in the Resume are obviously much longer than that.)[1]  See Ex. A.

## II. Materials Reviewed

I have reviewed materials sent to me. These materials include substantive pleadings in what appear to be three or so separate cases plus exhibits, discovery plus attached exhibits, affidavits or their near relatives, letters sometimes with attachments (including for example the correspondence between Nancy Kaechlen and Peacock Construction ("PCCI") as well as its lawyer), hearing transcript pages, court orders and/or opinion(s), assignments and related documents, the Hartford Lloyd's ("HLI") policy (and there is no Hartford Casualty ("HCI") policy for South Texas Masonry ("STM")), claims notices, e.g., with respect to workers comp claims, the underwriting file, the adjustment file, form documents entitled *Certificate of Liability Insurance* (some of which have been filled in to some degree apparently by in intermediary—

---

[1] Of course, Rule 26(a)(2)(B) also requires disclosure as to the amount I am being paid. My fee in this case is $300-per hour, plus expenses.

usually, at least, without reference to HLI and sometimes without reference to STM), agreements pertaining to releases and settlements, and various other documents. I have tried to list them in Exhibit B which was provided to me. I have not yet been provided with deposition transcripts; indeed, I understand that none has sent taken in this case. I suspect I will be provided with depositions and exhibits thereto as the case evolves. I have also received a few other brief documents on March 8, 2005, plus the adjustment file, which I spend most of the day reading and reviewing. My office has produced, i.e., found a few cases from Texas and around the country, which I have now read and/or reviewed, and some of which are cited. They are all in the same eset of files. Ex. B-I, B-II, & B-III.

### III. Facts, Allegations, Positions, and Assumptions

This section should be taken to incorporate all reports, assertions of fact, allegations, etc., which have been provided me, which I have deduced, or which I have otherwise inferred. The foundation for all of this material is to be found in the documents provided me or what has been said to me.

The underlying tort case may be called *Salazar v. Peacock Construction & Consolidated Crane.* This action was filed in state court in Texas, to wit, the 404th Judicial District Court in Cameron County, with Cause No. 2003-11-4371-G. The plaintiffs asserted that on or about October 23, 2002 the plaintiffs were working at a construction site on the 10th floor. The Las Dunas condo site was in the works. The plaintiffs were leaving the site at the end of the work-day. A craned allegedly dropped a load of rebar on them. One plaintiff was killed, and one was severely injured. Allegedly, the load fell when the gantry of the crane collapsed since overloaded. Peacock had leased the crane from Consolidated. The plaintiffs worked for STM,

although they may technically have been formally employed by another firm.  Apparently, those operating the crane worked for Peacock.  The rebar itself may have belonged to STM.

HLI insured STM and defended it in the underlying case.  I gather that this defense is continuing, although I am not yet sure of the precise context or exact circumstances.  PCCI requested defense and indemnity coverage, and—as I understand it—HLI indicated that, first, PCCI was not an additional (unnamed) insured under the HLI/STM policy; second, that if it were the language of the policy would not trigger coverage under §C.2.f and/or, third,  falls outside of indemnitee coverage because of §A: Coverage Extension—Supplementary Payments[:] 2, and/or any other relevant indemnitor-indemnitee coverage and exclusionary language.  This material is contained in a letter dated April 3, 2003, which also stated that it keeps open the insurer's right to reconsider, consider again, and reach the same bottom line conclusion based on different grounds, if they exist.

In June 2004 the case settled.  There are settlement documents which involve promises to pay, warranties, assignments, etc.  The amounts paid to the plaintiffs were $1.5m and $150t.  The released parties agreed to assign to the plaintiffs rights and hence actions they had "against Hartford," "McQueary," and STM.   (The wording of this part of the agreements is complex, so I am not sure I understand it all yet.  For example, I am not sure what, if anything, Clarendon Insurance, First Mercury Insurance, and/or United National Insurance have or are thought to have validly assigned, if anything, as against HLI.  It does seem clear that with respect to "The Hartford" or the Hartford group, simpliciter, only rights against HCI were assigned in these documents and that nothing against HLI was, at least originally, assigned. See p. 7 of 17 and 12 in the two related and connected "Release and Settlement Agreement[s]," the document entitled "Assignment" executed by PCCI, it looks like, and the document entitled "Assignment" executed

by the above referenced liability insurers. At least some of the plaintiffs, PCCI, and the three

relevant insurers have endeavoured to attend to this matter with several documents entitled

"Addendum to Assignment." (Presumably this implies that the plaintiffs through their counsel

recognize and acknowledge that naming the right insurer may be important in relevant legal

documents.)

As I understand it, the plaintiffs have now sued HLI in state court and that HLI has

removed the case to federal court and filed its own action. The plaintiffs are seeking actual

damages, statutory bad faith based damages, common law bad faith, i.e., negligence by a liability

insurer, type damages (I suppose even though no such cause of action exists in this sort of case

or is pleaded), attorney's fees, and so forth. HLI is seeking a declaratory judgment, legal fees,

and so forth.

### IV. My Current Opinions

In my opinion, HLI has not violated 21.21, 21.55, or the DTPA in any pleaded and/or

relevant way. (There is no action for common law bad faith pleaded, and it does not exist,

though if it did, my opinion would be the same.) HLI's construction or interpretation is not only

at least reasonable under the circumstances, it is correct. Hence, there has been no breach of

contract by HLI in dealing with PCCI. If any behavior affects coverage under this policy, it is

that of those involved other than HLI, e.g., Peacock and those cooperating with it. If a right to

reform a contract can be assigned, which I doubt given the evolution of Texas law, the HLI-

Peacock needs no reformation so far a this case is concerned. No behavior by the insurer here,

HLI, tends toward supporting a cause of action for promissory estoppel. The insurer, HLI, as not

negligent, even if it made some sort of relevant error (which I reject). And the negligence of the

intermediary, if any, is not exported to and therefore visited upon the insurer.

A. *Coverage.* This is the place to begin, even though the reading of contracts and their meaning are sometimes said to be a legal issue and not a factual issue. The fact is that I am frequently permitted by courts to testify on this issue, perhaps since a good part of my life after 40 has been devoted to teaching insurance to law students and so forth. More importantly, it is helpful to get clear about coverage, or at least what I think about coverage, before I testify as to whether the adjusters behaved reasonably under applicable statutes or the common law. If I am right that there is no coverage, then there cannot be violative behavior of some sections of 21.21, for example; and if I am wrong, but not very wrong or not unreasonably wrong, then the same conclusion likely follows, perhaps because I, as a teacher, professor, and law-&-insurance lecturer for a fair fraction of my adult life can (at least sometimes) explain things with more conveyed certainty and/or rational confidence than many adjusters sometimes can under circumstances which are by nature at least quasi-professorial.

The relevant language of the contract does not require STM to obtain any sort of insurance for PCCI. Article 6.1 does not require that PCCI be covered in any liability insurance obtained. Actually, it does not even require that STM obtain CGL coverage, oddly enough. See *Trapani v. 10 Arial Way Associates,* 755 N.Y.S.2d 644 (App. Div. 2003). Let us suppose that STM is required by the contract to buy some liability coverage or other. There is nothing explicit in the language of Art. 6.1 which amounts to or entails *Buy some for PCCI.* It might be useful, consequentially,  to keep in mind the following remark by a Texas court, to wit: "the requirement that a subcontractor purchase general liability insurance before working on the job does not without more, make the general contractor a third party beneficiary of the insurance contract." *P. G.* Bell Co., v. United States *Fidelity and Guaranty Co.,* 853 S.W.2d 187, 190 (Tex. App.— Corpus Christi 1993, no writ). We shall return to the Certificate of Insurance presently.

- 13 -

1. Given the language of the contract between STM and PCCI, the latter did not become an additional insured under the HLI-STM policy. The contract did not contain the mandate or the directions. If such was intended, as it were, almost automatically, under the circumstances of this type situation or case, the relevant sections of the contract were poorly drafted. If not, then the PCCI-STM deal was poorly documented. The written document—contract, agreement, or permit—does not mandate coverage. See *Continental Casualty Co. v. Fina Oil & Chem. Co.*, 126 S.W.3d 163 (Tex. App.—Houston [1st Dist.] 2004). See *A.F. Lusi Construction v. Peerless Insurance Co.* 847 A.2d 254, 258-59 (R.I. 2004)

2. In the alternative, if PCCI became an additional insured under the policy, the trigger language is simply not met. The lifting and moving of the rebar by the crane does not appear to have been the work of STM, nor was it part of STM's operation.

3. Similarly, the indemnification requirements of Texas law which are built into and presupposed by the insurance contract were not met by the PCCI-STM contact.

Significantly, if any one of the preceding three conditions is met, then there is not coverage. There is more to be discussed which does not play a role in the April 2, 2003 communication of non-coverage. Nor could it have at the time!

4. Suppose none of A.1-A3 applies. The HLI policy is triggered only if PCCI becomes legally obligated to pay damages. If I have understood the settlement, release, and assignment agreements, that never happened. Other insurers paid on PCCI's behalf before it was ever adjudged to have been negligently injurious (and so forth) and hence before it ever became legally obligated to pay damages. As I understand it, PCCI can not now acquire any legal obligation to pay the plaintiffs in the underlying case for what happened on October 23, 2002. Hence the insuring agreement can never be triggered. If it cannot be triggered, then HLI can

never owe PCCI under the policy. Also, as I understand it, Peacock did not pay. Other insurers did. They are not now, apparently, seeking subrogation, although perhaps PCCI is seeking to enforce its liability insurers' subrogation rights which it acquired by assignment, something which is probably an absurd idea.

5. Significantly, the HLI policy, by its terms, is excess with respect to PCCI if PCCI had its own insurance. I have not seen the other policies, but if the HLI term is enforced as against the assignees of the other insurer's, then there is nothing to discuss. HLI cannot now owe anything. See Common Policy Conditions, Section I.

6. Section E.4 of the Liability Section of the HLI policy would apply if PCCI were an insured under the policy. Unless the insurer agrees to a settlement, it may not be sued for recovery under the policy absent a final judgment against an insured following an actual trial. That did not happen here. Nor did PCCI attempt to obtain relevant consent from HLI.

B. *Statutory Bad Faith:* It is not clear whether insurance bad faith claims are assignable, or—if they are ever assignable—when and under what circumstances they can be validly assigned. If I were asked on this subject to give my real beliefs and to give the arguments I actually embrace, as opposed to the ones I might be willing to advocate as a litigating lawyer, I would say that bad faith claims should not be assignable, if attorney malpractice claims—and the like--are not. This view is not only supported by extrapolations from and the reasoning of various cases, it is supported by the language of 21.21(10)(b), at least by implication.

Similarly, if I were asked to testify whether 21.55 applies to liability policies or to liability sections of complex, multi-faceted commercial insurance contracts, I would say that it does not and that this conclusion follows from the use of certain language in the statute. This

linguistic fact may not be known to people who are unfamiliar with the language is used in the circles of insurance—whether broad or narrow.

Of course, if there is no coverage, there can probably not be bad faith of any kind, and that observation would unequivocally be true in this case. Hence, for the further discussion I will assume that there is coverage. (This is an assumption for discussion purposes only. The proposition assumed is one which I believe to be false: there was no coverage between HLI and PCCI in this case or set of cases.)

1. *21.21(10)(a).* Even is there was some violation by HLI, the documents I have seen and the discussions I have had, do not support the view that any wrongful conduct was knowing. Therefore, I shall look only at the relevant sections of 21.21(10)(a). Of course, if PCCI was not an insured under the HLI-STM policy in the context of the underlying case, then this section of the statute could not apply. See (10)(a) and (10)(a)(v).

(i)   There was no misrepresention of the policy or of any material fact relating to coverage that I have seen, read about, or heard about. If an insurer correctly quotes a policy and then interprets the quote in a way which turns out to be error, there is no misrepresentation. The policy has been correctly stated and therefore correctly represented to the claimant. There may have been an error of construction, but no misrepresentational error. I know of no cases or opinions or anyone which authoritatively suggests or any trend of views which would imply that every interpretational error by an insurer with respect to an insurance contract constitutes a violation of this statutory section. Any such view would entail that every interpretational error by an insurer of a policy constitutes a violation of the statute. See also (10)(a)(v)(A).

(ii) This section makes it violative for an insurer to fail to "attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's

liability has become reasonable clear." There are two claims to consider here: the tort claim against PCCI and PCCI's insurance claim. Assuming that HLI had liability on both of these claims (i.e., applying the above referenced assumption), its liability is not yet reasonably clear, sop that this section has not been violated.

(iv) There is no violation of this section, even if there is coverage. HLI wrote to PCCI in a timely manner. Also, there was never a time when PCCI was left defenseless or even financing its own defense. Further, there was never a time when PCCI was picking up the payment of its own damages.

(viii) Given the reasons why coverage was denied, there was a reasonable investigation into the relevant aspects of the claim.

No other part of (10)(a) appears to apply. I have reviewed them in the context of preparing this opinion, and none of them has been relevantly violated here (if at all). The same point applies to (10)(b).

2. *21.55*. As already indicated, I do not believe that 21.55 applies to liability insurance. In fact, I affirmatively believe it does not. However, if it did, there would be no liability here on the part of HLI. This is true even if PCCI were an insured. It did not supply HLI with appropriate and needed documentation—the sorts of things an insurer from whom payment is expected or sought--in a timely enough way to trigger insurer duties under the statute. Under circumstances like the one found in this case, insurers do not usually explicitly require information. If I were advising a policyholder, however, which I often do, I would suggest that they supply information to the insured in any case, and I would suggest that it be elaborate and exhaustive. So such thing happened here. Moreover, no proof of loss has ever been provided HLI, as should be if 21.55 were to apply.

All of the statutory bad faith observations and opinions, as well as the coverage opinions apply to HLI and HCI both. HCI was not a party to the contract. The intermediary's references to it are completely irrelevant to both coverage and bad faith.

D. *Common Law Bad Faith.* As already indicated, this cause of action does not apply to liability insurance in Texas. If it did, it would not trigger coverage here because the actions of the insurer are not unreasonable under the circumstances given the language of the insurance contract the language and the "Gen-Sub" contract. Hence, even if there is coverage, there is no insurer bad faith under Texas common law. Even if PCCI had coverage, it was not treated badly, unjustly, or what have you under the insurance contract, or poorly given the insurer-insured relationship.

E. *Insured's Duties.* Given the material provided me, I have concluded that PCCI did not comply with significant provisions of the HLI-STM insurance contract. These provisions are well known, at least in standard terms, across the board in primary liability contracts. In the contract with respect to which PCCI's supposed assignees are seeking coverage, the provisions are these: BLCF §E.2.b.c.(1)-(4) and perhaps d. There has been no explicit waiver by HLI. Arguably, the letter previously discussed did not imply a waiver and constitute any sort of estoppel. If I have been advising PCCI as to this matter (and I often advise insureds as to such matters) I would have advised them to comply with sections c and d in the underlying case, as time went along. If PCCI's noncompliance with the discussed section is relevant, then there cannot be contract coverage now, even if there previously was, and all bad faith contentions are accordingly defeated

F. *DTPA.* I have not seen any facts in this case which suggest any DTPA violations by HLI or HCI.

G. *Negligence.* I have not discerned negligence on the part of either HLI or HCI. (Even if there were some, I do not see any bodily injury having been caused by either of these entities, or—indeed—any injury at all.

H. *Gross Negligence or Intentional Tort: Punitive-Exemplary Damages.* Since there is no negligence by any defendant there is no gross negligence. Even if there were negligence, there is no evidence of any recklessness or intent to injure. (It has been represented to me that none surfaced at the depositions held on March 7, 2005.) There is no evidence of any intentional misconduct by either defendant in this context, so that cannot be an intentional tort which would support an award of punitive-exemplary damages.

I. *Promissory Estoppel.* I have seen nothing which suggests that either defendant is subject to any sort of estoppel.

J. *Reformation.* I have seen to evidence which suggests that some document within the control of any defendant in this case should be reformed or changed in any manner. Perhaps the plaintiffs believe that the Certificate of Insurance issued by the intermediary should be reformed. Of course, the issuer is not a party to this litigation, so it would be inappropriate to obtain that result. There is no symmetrical mutual mistake here.

K. *Intermediary: Certificate of Insurance.* When the intermediary issued a Certificate of Insurance, I have seen nothing to suggest that it was the agent of HLI, that it was authorized to do what it did, or that the designation of HCI should be ignored, even though it is an error. I have already suggested that the Certificate contains a significant error which is often understood in the industry to stand in the way of coverage. More significantly the language on the certificate itself does not empower it to create coverage if it does not exist under the policy together with documents it authorizes as authoritative. In fact the language of the Certificate blocks any such

- 19 -

creation. See *Marlin v. Wetzel County Board of Education v. Commercial Union Ins. Co.,* 569

S.E.2d 462 (W. Va. 2002). See also Richard Glucksman, et al, *Additional Insured Endorsement:*

*Their Vital Important in Construction Defect Litigation,* 21 CONSTRUCTION LAWYER 30

(2001).

## IV. Conclusion

The forgoing summarizes my work, the work done at my direcytion and the opinions it

lead to in me. To the extent that I have the right or option to do so, I reserve whatever I have to

revise and update this opinion as the case develops.

_____

MICHAEL SEAN QUINN
March 8, 2005

50259 PEACOCK V. HARTFORD
MATERIALS RECEIVED

# INDEX I

| | | |
|---|---|---|
| 1. | ORIGINAL THIRD-PARTY PETITION | 02/19/2004 |
| 2. | DEFAULT JUDGMENT | 04/27/2004 |
| 3. | FIRST AMENDED ORIGINAL THIRD-PARTY PETITION | 05/04/2004 |
| 4. | REQUEST TO THE COURT FOR ISSUANCE OF CITATION TO MCQUERY HENRY BOWLES TROY, LLP AND HARTFORD CASUALTY INSURANCE COMPANY | 05/04/2004 |
| 5. | AGREED MOTION FOR NEW TRIAL | 05/21/2004 |
| 6. | SIGNATURE PAGE (PEACOCK'S) TO AGREED MOTION FOR NEW TRIAL | 05/24/2004 |
| 7. | MOTION FOR SEVERANCE | 05/25/2004 |
| 8. | AGREED ORGER GRANTING MOTION FOR NEW TRIAL PREVIOUS DEFAULT JUDGMENT ENTERED ON 04/27/2004 IS HEREBY SET ASIDE | 05/27/2004 |
| 9. | ORDER SETTING HEARING ON THIRD-PARTY DEFENDANT MCQUERY ET AL'S MOTION TO ABATE | 05/27/2004 |
| 10. | THIRD PARTY DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S ORIGINAL ANSWER AND COUNTERCLAIM FOR DECLATORY RELIEF | 06/03/2004 |
| 11. | LETTER TO COUNSEL REQUESTINF CONSENT TO MOTION TO ABATE, ABD THEREFORE NO NEED FOR HEARING ON SAME | 06/09/2004 |
| 12. | ORDER FOR SEVERANCE OF ACTIONS | 06/10/2004 |
| *13. | THIRD-PARTY PLAINTIFF'S PEACOCK CONSTRUCTION COMPANY INC.'S RESPONSES TO THIRD-PARTY DEFENDANT, MSQUERY ET AL'S REQUEST FOR DISCLOSURES | 06/09/2004 |
| *14. | THIRD-PARTY PLAINTIFF'S PEACOCK CONSTRUCTION COMPANY, INC.'S SUPPLEMENTAL RESPONSES TO THIRD-PARTY DEFENDANT, MCQUERY, ET AL'S REQUEST FOR DISCLOSURES | 06/15/2004 |
| *15. | THIRD-PARTY PLAINTIFF'S PEACOCK CONSTRUCTION COMPANY, INC.'S ANSWERS TO THIRD-PARTY DEFENDANT MCQUERY ET AL'S WRITTEN INTERROGATORIES | 06/15/2004 |
| *16. | THIRD-PARTY PLAINTIFF'S PEACOCK CONSTRUCTION COMPANY INC.'S RESPONSES TO THIRD-PARTY DEFENDANT MCQUERY ET AL'S REQUEST FOR PRODUCTION | 06/15/2004 |
| 17. | CORRESCT EXHIBIT 1 INADVERTENTLY LEFT OUT OF FIRST AMENDED ORIGINAL THIRD-PARTY PETITION | 06/18/2004 |
| 18. | LETTER TO 404TH COURT COORDINATOR ADVISING THAT PLAINTIFFS AND INTERVENORS SETTLE THEIR CLAIMS AGAINST DEFENDANTS; THEREFORE, NO NEED FOR JURY PANEL ON 6/28/2004 TRIAL SETTING | 06/25/2004 |
| 19. | PLAINTIFFS' AND INTERVENORS MARIA GUADALUPE SALAZAR'S MOTION TO DISMISS WITH PREJUDICE | 06/28/2004 |

50259 PEACOCK V. HARTFORD
MATERIALS RECEIVED

| | | |
|---|---|---|
| 20. | ORDER GRANTING PLAINTIFFS' AND INTERVENOR MARIA GUADALUPE SALAZAR'S MOTION TO DISMISS WITH PREJUDICE | 06/28/2004 |
| 21. | INTERVENOR JOSE M. GRACIA'S MOTION TO DISMISS WITH PREJUDICE | 06/29/2004 |
| 22. | AGREED ORDER ON THIRD-PARTY DEFENDANT MCQUERY ET AL'S MOTION TO ABATE | 06/30/2004 |
| *23. | THIRD-PARTY PLAINTIFF'S PEACOCK CONSTRUCTION COMPANY INC.'S SUPPLEMENTAL REPOSNSES TO MCQUERY ET AL'S REQUEST FOR PRODUCTION | 06/29/2004 |
| 24. | DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY AND HARTFORD LLOYD'S INSURANCE COMPANY'S FIRST AMENDED ORIGINAL ANSWER AND COUNTERCLAIM FOR DECLARATORY RELIEF | 06/30/2004 |
| 25. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURNACE COMPANY'S NOTICE OF REMOVAL | 07/01/2004 |
| 26. | ORIGINAL VERIFICATION PAGE TO DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY AND HARTFORD LLOYD'S INSURANCE COMPANY'S FIRST AMENDED ORIGINAL ANSWER AND COUNTERCLAIM FOR DECLARATORY RELIEF | 07/01/2004 |
| 27. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S COUNSEL OF RECORD BEING FILED WITH THE UNITED STATES DISTRICT COURT | 07/01/2004 |
| 28. | CIVIL COVER SHEET FROM REMOVAL FROM STATE COURT | 07/01/2004 |
| 29. | DEFENDANTS HARTFORDS CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S INDEX OF DOCUMENTS BEING FILED WITH THE UNITED STATES DISTRICT COURT | 07/01/2004 |
| 30. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S NOTICE TO STATE COURT OF REMOVAL FROM FEDERAL COURT | 07/01/2004 |
| 31. | ORDER SETTING CONFERENCE | 07/02/2004 |
| 32. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S CERTIFICATE OF FINANCIALLY INTERESTED PARTIES | 07/16/2004 |
| 33. | ORDER ON INTERVENOR JOSE M. GRACIA'S MOTION TO STRIKE INTERVENTION OF EVERARDO ABREGO | 07/26/2004 |
| 34. | ORDER ON INTERVENOR JOSE M. GRACIA'S MOTION TO DISMISS WITH PREJUDICE | 07/26/2004 |
| 35. | ORDER ON INTERVENOR JOSE M. GRACIA'S MOTION FOR APPORTIONMENT OF ATTORNEY'S FEES AND COSTS | 07/26/2004 |
| 36. | PEACOCKS PROPOSED JOINT DISCOVERY/CASE MANAGEMENT PLAN UNDER RULE 26(F) FEDERAL RULES OF CIVIL PROCEDURE | 08/16/2004 |
| 37. | NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL | 08/16/2004 |

50259 PEACOCK V. HARTFORD
MATERIALS RECEIVED

| | | |
|---|---|---|
| *38. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S INITIAL DISCLOSURES | 08/30/2004 |
| 39. | CONSENT TO PROCEED BEFORE A MAGISTRATE JUDGE | 08/31/2004 |
| 40. | RULE 16 FRCP SCHEDULING ORDER | 08/31/2004 |
| 41. | AMENDED RULE 16 FRCP SCHEDULINH ORDER | 09/08/2004 |
| 42. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST REQUESTS FOR ADMISSION TO DEFENDANT HARTFORD LLOYD'S INSURANCE COMPANY | 09/30/2004 |
| 43. | MOTION FOR LEAVE OF COURT TO FILE INTERVENTION, CROSS-CLAIM AND THIRD-PARTY ACTION | 09/30/2004 |
| 44. | NOTICE OF CHANGE OF ADDRESS | 10/07/2004 |
| 45. | ORDER SETTING HEARING DATE FOR 10/28/2004 @10:30AM ON "MOTION FOR LEAVE OF COURT TO FILE INTERVENTION, CROSS-CLAIM AND THIRD-PARTY ACTION" | 10/12/2004 |
| 46. | MOTION TO REMAND WITH: CERTIFICATE OF CONFERENCE, REQUEST FOR ORAL ARGUMENT, NOTICE OF SUBMISSION DATE, AND PROPOSED ORDERS (2) OF REMAND | 10/22/2004 |
| 47. | iDOCKET INDICATING STATUS OF: HEARING ON PLAINTIFFS' MOTION FOR LEAVE OF COURT TO FILE INTERVENTION, CROSS-CLAIM AND THIRD-PARTY ACTION AGAINST HARTFORD LLOYD'S INSURANCE COMPANY- COURT LEAVES MOTION PENDING AS CASE IS IN FEDERAL COURT | 10/28/2004 |
| 48. | PLAINTIFF'S AMENDED MOTION TO REMAND (WITH AUTHORITIES) WITH: CERTIFICATE OF CONFERENCE, REQUEST FOR ORAL ARGUMENT, NOTICE OF SUBMISSION DATE, AND PROPOSED ORDER OF REMAND | 11/01/2004 |
| 49. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S RESPONSE TO PLAINTIFF, PEACOCK CONSTRUCTION COMPANY, INC.'S AMENDED MOTION TO REMAND | 11/08/2004 |
| 50. | PLAINTIFF'S INITIAL DISCLOSURES TO DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY AND HARTFORD LLOYD'S INSURANCE COMPANY | 11/23/2004 |

50259 PEACOCK V. HARTFORD
MATERIALS RECEIVED

# INDEX II

| 1. | ORDER SETTING HEARING HEARING ON PLAINTIFF'S (AMENDED) MOTION TO REMAND | 11/29/2004 |
| 2. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S SUPPLEMENTAL RESPONSE TO PLAINTIFF, PEACOCK CONSTRUCTION COMPANY, INC.'S AMENDED MOTION TO REMAND | 12/01/2004 |
| *3. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S ANSWERS, RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND FIRST REQUESTS FOR PRODUCTION | 12/06/2004 |
| *4. | THIRD-PARTY DEFENDANT MCQUEARY ET AL'S AMSWERS AND OBJECTIONS TO THIRD-PARTY PLAINTIFF PEACOCK CONSTRUCTION COMPANY INC.'S FIRST SET OF WRITTEN INTERROGATORIES | 12/10/2004 |
| *5. | THIRD-PARTY DEFENDANT MCQUEARY ET AL'S RESPONSES TO REQUESTS FOR DISCLOSURE | 12/10/2004 |
| 6. | COURTROOM MINUTES: HEARING ON MOTION TO REMAND; MOTION TAKEN UNDER ADVISEMENT | 12/16/2004 |
| *7. | PLAINTIFF'S RESPONSES TO DEFENDANT HARTFORD LLOYD'S INSURANCE COMPANY'S REQUESTS FOR ADMISSION | 12/20/2004 |
| *8. | PLAINTIFF'S RESPONSES TO DEFENDANT HARTFORD LLOYD'S INSURANCE COMPANY'S INTERROGATORIES | 12/20/2004 |
| *9. | PLAINTIFF'S RESPONSES TO DEFENDANT HARTFORD LLOYD'S INSURANCE COMPANY'S REQUEST FOR PRODUCTION | 12/21/2004 |
| *10. | PLAINTIFF'S SUPPLEMENTAL DISCLOSURES TO DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY AND HARTFORD LLOYD'S INSURANCE COMPANY | 01/06/2005 |
| *11. | DEFENDANTS HARTFORD CASUALTY INSURANCE COMPANY'S AND HARTFORD LLOYD'S INSURANCE COMPANY'S EXPERT DISCLOSURES | 01/13/2005 |
| 12. | LETTER | 01/18/2005 |
| 13. | PLAINTIFF'S UNOPPOSED MOTION TO AMEND PLEADINGS AND FILE ANSWER (WITH ATTACHED ORDER) | 01/18/2005 |
| 14. | PLAINTIFF'S THIRD AMENDED COMPLAINT | 01/18/2005 |
| 15. | PLAINTIFF'S ANSWER TO COUNTER-CLAIM | 01/18/2005 |
| 16. | PLAINTIFF'S OPPOSED MOTION TO JOIN ADDITIONAL PARTIES (WITH ATTACHED ORDER) | 01/18/2005 |
| 17. | DEFENDANT HARTFORD LLOYD'S INSURANCE COMPANY'S RESPONSE AND OBJECTION TO PLAINTIFF PEACOCK CONSTRUCTION COMPANY, INC.'S OPPOSED MOTION TO JOIN ADDITIONAL PARTIES | 01/19/2005 |
| 18. | ORDER DENYING PLAINTIFFS MOTION TO REMAND | 01/21/2005 |
| 19. | MOTION TO REMAND | 01/27/2005 |

50259 PEACOCK V. HARTFORD

MATERIALS RECEIVED

| | | |
|---|---|---|
| 20. | PLAINTIFF'S OPPOSED MOTION TO JOIN INDISPENSIBLE PARTIES (WITH AUTHORITIES) | 01/27/2005 |
| 21. | DEFENDANT HARTFORD LLOYD'S INSURANCE COMPANY'S RESPOSNSE TO PLAINTIFF PEACOCK CONSTRUCTION COMPANY INC.'S OPPOSED MOTION TO JOIN INDISPENSIBLE PARTIES | 02/03/2005 |
| 22. | PLAINTIFF'S OPPOSED MOTION TO COMPEL DISCOVERY | 02/07/2005 |
| 23. | STIPULATION OF DISMISSAL | UNDATED |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ADDITIONS...

| | | |
|---|---|---|
| 24. | APRIL 3, 2003 LETTER | |
| 25. | AFFIDAVIT OF JAMES FISCHER | 06/29/2004 |
| 26. | ASSIGNMENT (SALAZAR) | 06/2004 |
| 27. | ASSIGNMENT (PEACOCK) | 06/17/2004 |
| 28. | ADDENDUM TO ASSIGNMENT (UNITED NATIONAL INSURANCE) | 09/23/2004 |
| 29. | ADDENDUM TO ASSIGNMENT (PEACOCK) | 09/2004 |
| 30. | ADDENDUM TO ASSIGNMENT (CLARENDON INSURANCE CO.) | 09/2004 |
| 31. | INVOICE FROM CERTIFIED REPORTING AND VIDEO SERVICE | 02/11/2004 |
| 32. | INVOICE FROM LAW OFFICE OF TREY MARTINEZ | 05/20/2004 |
| 33. | LETTER FROM THE LAW OFFICE OF TREY MARTINEZ | 05/20/2004 |
| 34. | LETTER FROM HARTFORD (CLAIM SERVICE CONSULTANT) | 07/09/2004 |
| 35. | LETTER FROM ED BARKER TO TREY MARTINEZ'S ASSISTANT | 06/16/2004 |
| 36. | HARTFORD CLAIM SERVICE NOTES | UNDATED |
| 37. | ORIGINAL PETITION IN INTERVENTION, CROSS-CLAIM AND THIRD PARTY ACTION | 09/30/2004 |

50259 PEACOCK V. HARTFORD
MATERIALS RECEIVED

# INDEX II

1. ADJUSTMENT FILE
2. VARIOUS CASES
3. POLICY
4. CLERK'S ENTRIES
5. PLEADINGS INDEX
6. DISCOVERY INDEX