# Peacock Construction, et al v. McQueary Henry Bowles, et al

## Witness: Michael Sean Quinn

## March 11, 2005

## Job No. 050311BJW





**WRIGHT ◆ WATSON**
& ASSOCIATES, LLC

1801 North Lamar Boulevard, Mezzanine Level

Austin, Texas 78701 ◆ www.wrightwatson.com

512.474.4363 ◆ FAX 512.474.8802 ◆ 800.375.4363

Peacock Construction, et al v.         Michael Sean Quinn
McQueary Henry Bowles, et al          March 11, 2005

1

```
          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS
                 BROWNSVILLE DIVISION
PEACOCK CONSTRUCTION         )
COMPANY, INC.,               )
        Plaintiff,           )
                             )
                             )
VS.                          ) CIVIL ACTION NO. B-04-111
                             )
HARTFORD LLOYDS INSURANCE    )
COMPANY,                     )
        Defendant.           )


            CAUSE NO. 2002-11-4371-G

PEACOCK CONSTRUCTION         )  IN THE DISTRICT COURT
COMPANY, INC., ET AL.,       )
    Third-Party Plaintiffs,  )
                             )
                             )
VS.                          )  CAMERON COUNTY, TEXAS
                             )
McQUEARY HENRY BOWLES &      )
TROY, L.L.P., AND SOUTH      )
TEXAS MASONRY, ET AL.,       )
    Third-Party/Cross        )
    Defendants.              )  404TH JUDICIAL DISTRICT

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                  ORAL DEPOSITION OF
                 MICHAEL SEAN QUINN
                   MARCH 11, 2005
                     Volume 1

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

          ORAL DEPOSITION OF MICHAEL SEAN QUINN,
produced as a witness at the instance of the
PLAINTIFF, and duly sworn, was taken in the
```

| 6 | 8 |
|---|---|
| 1     (Deposition Exhibit No. 1 | 1   to it as Quinn's long and oppressive resume. |
| 2     (marked for identification. | 2     Q. All right. To save a few trees, I will not |
| 3     MICHAEL SEAN QUINN, | 3   attach it as an exhibit to your deposition, sir -- |
| 4   having been first duly sworn, testified as follows: | 4     MR. BARKER: Let me go ahead and ask |
| 5     EXAMINATION | 5   that we do attach a copy. I've got a copy. |
| 6   QUESTIONS BY MR. CARRERA: | 6     MR. CARRERA: Fine. We can do that. |
| 7     Q. Would you state your full name for the | 7   Okay. I guess, Mr. Barker, you're not as concerned |
| 8   record, please. | 8   over the trees as I am. |
| 9     A. Michael Sean Quinn. | 9     MR. BARKER: No, I'm sorry. I'm not. |
| 10     Q. And Mr. Quinn, can you give me a business | 10     Q. (BY MR. CARRERA) Okay. Mr. Quinn, my name |
| 11   address and telephone number? | 11   is Victor Carrera and I represent Peacock Construction |
| 12     A. Yes. 2630 Exposition Boulevard, Suite G-10, | 12   Company, its insurers and their assignees in some |
| 13   Austin, Texas 78703. Did you want the telephone | 13   litigation that's pending in two cases. One is |
| 14   number? | 14   pending in the United States District for the Southern |
| 15     Q. Please. | 15   District of Texas, Brownsville Division, and the other |
| 16     A. (512) 542-9243. | 16   is pending in the 404th Judicial District Court of |
| 17     Q. And what do you for a living, sir? | 17   Cameron County, Texas. The litigation relates to |
| 18     A. Well, this is a law firm. And I am -- I | 18   insurance coverage matters with regard to Peacock |
| 19   classify myself mostly as a lawyer, although an awful | 19   Construction Company, which was an original defendant |
| 20   lot of my time these days is spent being an expert | 20   in an underlying lawsuit that had been brought against |
| 21   witness. | 21   it by the family of an individual that -- who was |
| 22     Q. And you say a lot of your time is spent as | 22   killed, and also by two individuals who were injured |
| 23   an expert witness. In what particular area, sir? | 23   in a crane collapse that occurred on South Padre |
| 24     A. There are two areas. The majority of the | 24   Island, Texas, in October of 2002. The original |
| 25   time is spent on insurance related matters and the | 25   plaintiffs in the lawsuit sued Peacock Construction |

| 7 | 9 |
|---|---|
| 1   minority of the time is spent on lawyer misconduct and | 1   Company and another company named Consolidated Crane, |
| 2   pricing legal fees, reasonableness of legal fees. | 2   and I'm going to refer to that as the original or |
| 3     Q. Okay. And where did you get your legal | 3   underlying litigation. Okay? |
| 4   education, sir? | 4     A. Sure. What was -- I thought South Texas |
| 5     A. University of Missouri, Kansas City. | 5   Masonry was also a defendant in the underlying |
| 6     Q. And what year was that? | 6   lawsuit. Am I wrong? |
| 7     A. I graduated in 1980. | 7     Q. You are incorrect about that. |
| 8     Q. And when did you become a lawyer in Texas? | 8     A. Okay. |
| 9     A. 1980. | 9     Q. They were perhaps a third-party defendant -- |
| 10     Q. Prior to becoming a lawyer, what did you do | 10     A. Okay. |
| 11   for a living? | 11     Q. -- brought in on an insurance issue. |
| 12     A. I was a teacher. | 12     A. Okay. |
| 13     Q. Just as a schoolteacher? | 13     Q. But they were not originally sued as |
| 14     A. Yes. | 14   defendants. |
| 15     Q. Okay. What subjects did you teach? | 15     A. Okay. |
| 16     A. I taught principally philosophy. | 16     Q. And it is my understanding they could not be |
| 17     Q. At the university level or -- | 17   sued because of the workers' compensation bar. |
| 18     A. Yes. | 18     A. Okay. |
| 19     Q. Do you have a Ph.D.? | 19     Q. In any event, there is an issue as to |
| 20     A. Yes. | 20   whether or not a commercial general liability policy |
| 21     Q. And what is that, sir? | 21   purchased by South Texas Masonry provided coverage to |
| 22     A. In philosophy. | 22   Peacock Construction Company with regard to that |
| 23     Q. Okay. I know somewhere we've gotten a very | 23   incident. And is that basically your understanding as |
| 24   long resume for you, it's 42 pages or so -- | 24   to why we're here? |
| 25     A. We refer to it -- in this office, we refer | 25     A. Yes. |

3 (Pages 6 to 9)

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

---

**14**

1  Insurance Company has been dismissed from this
2  litigation?
3      A.  No.  This is news to me.
4      Q.  Okay.
5      A.  In which case, there is a fair amount in my
6  report that's -- that will just -- that I ought to
7  change, because I keep talking about Hartford Casualty
8  and give it a special abbreviation, but if they're
9  gone, they're gone.
10     Q.  You have mentioned your report.  Let me show
11 you what I have had marked as Exhibit 1 to your
12 deposition and ask if you could identify that, please.
13     A.  Well, I -- Exhibit 1 has marked -- the first
14 couple of pages of it says some stuff about me, and
15 I'm not sure I have ever seen that.
16     Q.  Can you identify what the -- what the
17 instrument purports to be?
18     A.  Yeah.  It says it's a defendant, Hartford
19 Lloyds Insurance Company's supplementary expert
20 disclosures.  I -- it has the pleading on it, so I
21 assume it was filed with the Court.  And then there is
22 three pages and the final page.  On the third page,
23 Barker has signed it.  On the fourth page, which is I
24 have distributed it to people, that was on March the
25 9th, which I guess would be yesterday or the day

**15**

1  before.  And so -- and I haven't seen it.  The
2  remainder of it, the last page of the -- the last
3  pages are exhibits to my -- to my report.  The 20th
4  page is my signature, and all of the other pages look
5  like they're right.  Now, the -- my resume is listed
6  as a -- as an exhibit to this, but it's not here.
7      Q.  Okay.  But your report is attached to
8  Exhibit 1?
9      A.  Yes, sir.  As Exhibit A.
10     Q.  As Exhibit A to Exhibit 1.
11     A.  Yes, sir.
12     Q.  And also, the indices that you provided me
13 copies of prior to your deposition are also attached
14 thereto.  Correct?
15     A.  Yes.  Yes.
16     Q.  And Mr. Barker has indicated that he wants
17 your resume attached to the deposition, and we will
18 attach that as Exhibit 2.
19          (Deposition Exhibit No. 2
20          (marked for identification.
21     Q.  (BY MR CARRERA)  And in the interest of
22 time, we'll -- do you have a copy of that, sir?
23     A.  It's in -- okay.
24          MR. BARKER:  Here it is.
25     Q.  Which is a 42-page document.

**16**

1          MR. WEATHERED:  This is
2  Frank Weathered.  Ed?
3          MR. BARKER:  Yes, sir.
4          MR. WEATHERED:  I can hear Victor
5  really well.  I'm having a difficult time hearing your
6  witness.
7          THE WITNESS:  I'll speak up.  If you
8  don't hear me in the future, just call out and I'll --
9  and I'll talk louder.  Sorry.
10          MR. WEATHERED:  Well, I don't mean to
11 interrupt you.  I'm just -- it -- the problem might be
12 on my end.  I don't know.  I just thought I would
13 bring it up while we were shuffling paper.
14          THE WITNESS:  Well, the truth of the
15 matter is, my wife constantly complains she can't hear
16 me either, so I'll try to -- I'll try to speak up.
17          MR. WEATHERED:  Thank you.
18     Q.  (BY MR. CARRERA)  Mr. Quinn, Exhibit 2, for
19 the record, would you identify that, please?
20     A.  This appears to be -- it looks like -- it
21 looks like what I've earlier described as Quinn's long
22 and oppressive resume.
23     Q.  Okay.  Now, as part of Exhibit 1, there are
24 a couple of indices, which I understand are items that
25 you have reviewed in coming to your, I guess,

**17**

1  observations and opinions in this case.  Correct?
2      A.  I think I've -- I've looked through pretty
3  much everything on there, yeah.  I mean, I'm not aware
4  of anything I haven't read.
5      Q.  Okay.  And the dates thereon are the dates
6  of the documents you reviewed?
7      A.  I believe so, yes.
8      Q.  And --
9      A.  Now, this is -- this -- the indices were
10 prepared by a fellow in my office, and I haven't
11 actually reviewed it -- or a person in my office.  I
12 guess it's not a fellow, but a person in my office.
13 But in any case, there they are.
14     Q.  And you've brought to you -- to your
15 deposition about four folders, four or five folders
16 worth of materials.  And can you segregate those out
17 that were -- or are listed on those indices from those
18 that are not?
19     A.  I think so.  I think that everything except
20 the individual cases which are to be found there,
21 which are listed here on the last page as Various
22 Cases.  I think everything else is -- is listed in an
23 easily recognizable way.
24     Q.  Okay.  This folder here is the various
25 cases?

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

**22**

1  on page ten, just above the mid -- the title in the
2  middle, I say that there is Exhibits B-1, B-2 and B-3.
3  And what has happened is, is that as I've looked at
4  this, I realized that everything in the actual
5  attachment is either B-1 or B-2, and B-3 never -- for
6  some reason or other, whoever was doing it never
7  called it three, but calls it the last page of two.
8      Q.  Very well.  And that's the indices we're
9  talking about?
10     A.  Yes.
11     Q.  Okay.  Any other corrections that you can
12  think of?
13     A.  Not yet.
14     Q.  So on page nine you list the materials
15  reviewed, then you start with your -- and then on page
16  ten with a section marked Roman three, it's called
17  Facts, Allegations, Positions and Assumptions.
18     A.  Yes.
19     Q.  And you understand that the underlying
20  lawsuit was settled by a payment made by Peacock's
21  insurers --
22     A.  I do.
23     Q.  -- to -- to the plaintiffs, the original
24  plaintiffs in that case.  There was also a payment
25  made by the insurers for Consolidated Crane.

**23**

1      A.  I believe I knew that, yes.
2      Q.  And the insurers who paid on behalf of
3  Peacock, a grand total, I believe, of two million
4  dollars, contend that they are equity -- equitably
5  subrogated to the claims of Peacock against Hartford
6  Lloyds Insurance Company based on alleged coverage
7  under a commercial general liability policy issued by
8  Hartford Lloyds Insurance Company to South Texas
9  Masonry?
10     A.  Yes.
11     Q.  Okay.  What was your understanding of the --
12  of the demand that was made of Hartford Lloyds
13  Insurance Company and how they handled this claim by
14  Peacock, initially, for coverage under that commercial
15  general liability policy?
16     A.  Well, I'm not completely sure what the facts
17  are, but as I understand it, somebody contacted
18  Hartford and said, look, you need to step in and --
19  and defend Peacock, pay bills if necessary, because
20  they're an insured under the South Texas Masonry
21  policy.  And at this point, I don't quite know what
22  happened, but what would usually happen is that the
23  Hartford person or the person at the insurance company
24  would say, fine, I need to see -- I need to see
25  whatever contractual documents there are between

**24**

1  Peacock and South Texas Masonry, or whoever is the
2  contractor and the sub.  And that would be sent to
3  them.  And then they would take the -- the policy and
4  the -- they would take the policy and whatever
5  contract documents there were, and the process would
6  begin.  And as I understand it, what happened here was
7  that the people at Hartford's Houston office, who were
8  handling the claim, looked at the contract, looked at
9  the policy, and said, we don't think that we are --
10  that we don't think that Peacock is a covered --
11  covered entity under the policy, so go away.  No.  I
12  mean, they didn't say go away.  That's my slang but --
13     Q.  They denied coverage?
14     A.  It looks like it to me.  I mean, that is a
15  way to say it.  Now, probably they also said, as I
16  recall from the letter, it looks like to us there
17  isn't any coverage here.  So as things stand, you
18  know, we're not going to go forward.  If you've got
19  anything else to send us or talk to us or give us
20  something, we'll be happy to take a look at it.  I
21  mean, they didn't shut the file or anything.  As I
22  understand it, they also took over the defense of --
23  of South Texas Masonry to the extent that they were
24  somehow involved in the suit.
25     Q.  Okay.  But they've never provided a defense

**25**

1  or indemnification to Peacock.  There is no question
2  about that?
3      A.  I don't have any question about it.  That
4  was my understanding.
5      Q.  And let me get to the -- cut to the quick
6  here.  My understanding is that Hartford Lloyds
7  Insurance Company, number one, denied that Peacock
8  qualified as an additional insured under the South
9  Texas Masonry commercial general liability policy.
10     A.  Yes.
11     Q.  They also denied that there was any coverage
12  under an indemnity provision between the -- contained
13  within the subcontract agreement between South Texas
14  Masonry and Peacock Construction Company on the basis
15  that the indemnity provision was not conspicuous.  You
16  understand that to be the case also?
17     A.  I wouldn't use the word conspicuous, but
18  aside from quibbling about that, you and I would agree
19  that that was what was going on.
20     Q.  Are you aware that there was a letter sent
21  by a Ms. Nancy Kaechler to Peacock Construction
22  Company, I believe it was dated April --
23     A.  I think I have it.  April 3rd, 2003.
24     Q.  April 3rd, 2003?
25     A.  Yes, sir.

7 (Pages 22 to 25)

**Wright Watson & Associates, L.L.C.**
**(512) 474-4363**

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

**30**

1   them, yes.
2      Q.   Okay.
3      A.   So you've gone through all of the capital
4   letters, including the one that I made a mistake and
5   left out.
6      Q.   Okay. The fact that C is not in there is --
7   does not reflect any omission from your report. Is
8   that correct?
9      A.   No. It reflects -- it reflects typing
10  error.
11     Q.   Now, are you aware of any bad faith
12  pleadings that were made in this case?
13     A.   Common law bad faith?
14     Q.   Either common law or any type of bad faith,
15  statutory --
16     A.   I thought I was. I thought that -- that
17  there was a suggestion that there had been 2121
18  violations.
19     Q.   Okay.
20     A.   And DTPA, for that matter.
21     Q.   Let's talk about -- going to page 12.
22  You've -- you've opined -- and I'm going to sort of
23  try to, in the interest of time, condense some of your
24  observations here to -- but if I'm incorrect, would
25  you let me know?

**31**

1      A.   I'll try.
2      Q.   You found no violations on the part of
3   Houston -- excuse me -- Hartford Lloyds Insurance
4   Company of the Texas Insurance Code or the DTPA.
5      A.   True.
6      Q.   Then you have a paren that says, there is no
7   action for common law bad faith pleading and it does
8   not exist, though if it did, my opinion would be the
9   same.
10         So I guess you -- do you -- you found
11  nothing in the pleadings, but nothing that would
12  suggest that had they been pled or does -- would such
13  a cause of action exist, there would be no basis for
14  it?
15     A.   True.
16     Q.   Okay. But you felt that the insurance
17  companies -- Hartford Lloyds Insurance Company's
18  interpretation and construction of its policy was
19  reasonable under the circumstances, found no breach of
20  contract?
21     A.   Well, the -- the -- I mean, it's a -- two --
22  two slightly different points. If they're right, if
23  Hartford is right that there isn't any coverage, there
24  would be no breach of contract. If they were wrong
25  that there was -- that there was no coverage, in other

**32**

1   words, there was coverage, they wouldn't be guilty of
2   violating 2121, because what they did was not
3   unreasonable under the circumstances.
4      Q.   Okay. So if -- you -- you would grant that
5   if there is coverage in this case that you still feel
6   that there would be no extra-contractual basis for
7   damages against Hartford Lloyds Insurance Company
8   because their interpretation was reasonable under the
9   circumstances?
10     A.   Yes.
11     Q.   Now, I'm curious about the fourth sentence
12  about -- of this opening paragraph. Maybe the fifth
13  sentence. It says, if any behavior affects coverage
14  under this policy, it is that of those involved other
15  than HLI, e.g., Peacock and those cooperating with it.
16  What do you mean by that?
17     A.   Well, I'm not sure that I know exactly what
18  I mean completely, because I don't know who, if
19  anybody, was cooperating with Peacock. But what I
20  mean by that is, Peacock asked for coverage, and --
21  and so if any behavior affects coverage, if any
22  behavior affects coverage, it would be that Peacock
23  didn't do things it was supposed to do in order to
24  obtain coverage, and that is treated in section E on
25  page 18.

**33**

1      Q.   Oh, okay. We'll go get to that, then. Let
2   me just -- before we do that, though, I want to go
3   back to that. So are you saying in any way that
4   Peacock somehow may have done something that would
5   negate any potential coverage to it under the policy?
6      A.   No. It would be more like what it didn't
7   do.
8      Q.   Okay. The next sentence says something
9   like -- let me read it. It says, if a right to reform
10  a contract can be assigned, which I doubt given the
11  evolution of Texas law, the HLI-Peacock needs no
12  reformation so far as this case is concerned.
13         What did you mean by that?
14     A.   Well, if I've understood -- if I've
15  understood the underlying pleadings, the -- the
16  assignee of Peacock has asked that the contract of
17  insurance between South Texas Masonry and -- and --
18  and Hartford be reformed. I'm not at all sure that --
19  it seems to me that Hartford probably -- Hartford
20  probably can't do that. And -- I'm sorry. Peacock
21  can't do that. And if somehow or another this has
22  been assigned by Peacock to somebody else, and
23  if Peacock somehow had the right to reform that
24  contract to which it may not have been a party, and it
25  assigned that right to some -- to somebody -- it

**Wright Watson & Associates, L.L.C.**
**(512) 474-4363**

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

**38**

```
1              (Deposition Exhibit No. 5
2              (marked for identification.
3        Q.  (BY MR. CARRERA) Let me show you what has
4   been marked as Exhibit 5 to your deposition and ask if
5   you have seen that document before?
6        A.  I think that I have seen it.  I have
7   certainly seen the -- it's a four-page document and
8   I've certainly seen versions of the -- of the last two
9   pages.  Now, whether I've seen the -- the first two
10  pages, I don't remember, but I think so.
11             MR. WEATHERED:  This is Frank
12  Weathered.  Unfortunately, I was not at that other
13  deposition.  What is the -- what deposition exhibit
14  are we looking at exactly?
15             MR. CARRERA:  Right now we're looking
16  at Exhibit 5 to this deposition.  It may have been
17  marked in -- it may have been marked as a deposition
18  exhibit in the other one, but I can't tell you,
19  sitting here today, which one it is.
20             MR. WEATHERED:  Well, can you just
21  briefly tell me --
22             MR. CARRERA:  I'll tell you what it is.
23  What this document is, is a form that was sent by
24  Peacock Construction to all subcontractors prior to
25  their starting work.  Or that's what it's supposed to
```

**39**

```
1   be.  Okay?
2              MR. WEATHERED:  On Peacock Construction
3   letterhead?
4              MR. CARRERA:  Yes, it is.
5              MR. WEATHERED:  It says, Dear
6   Subcontractor?
7              MR. CARRERA:  Correct.
8              MR. WEATHERED:  And It's a -- there is
9   a letter and then --
10             MR. CARRERA:  There is two pages and
11  then two forms, one for a general liability insurance
12  certificate and one related to workers' compensation.
13             MR. WEATHERED:  Okay.  I'm with you.
14  And, again, I apologize for interrupting.
15        Q.  (BY MR. CARRERA) Mr. Quinn, you may have
16  seen these as part of an attachment to a letter from
17  Ruben Pena to Hartford Lloyds Insurance Company,
18  marked in Mr. Bartram's deposition as Bartram 14,
19  which we'll designate as Exhibit 6 to your deposition.
20             (Deposition Exhibit No. 6
21             (marked for identification.
22        Q.  (BY MR. CARRERA) Let me ask you if you've
23  seen that.  And --
24        A.  I believe so, yes.
25        Q.  And --
```

**40**

```
1        A.  Yeah.  In fact, I have seen the very
2   documents you're talking about attached to the Pena,
3   yeah.
4        Q.  Okay.
5              MR. CARRERA:  And for the record,
6   gentlemen, I'm talking about a letter dated
7   February 24, 2004, from Ruben Pena to
8   Ms. Nancy Kaechler of Hartford Lloyds Insurance
9   Company.
10       Q.  (BY MR CARRERA) And for purposes of
11  clarity, Mr. Quinn, because the certificate that is
12  attached to both of these exhibits appears to be cut
13  off -- or a portion of it seems to be cut off on the
14  left side, I'm going to show you a clearer version
15  that we obtained earlier this week from the claims
16  file at Hartford Lloyds Insurance Company.  It's a
17  document bearing Bates number 01137, and it just has a
18  clearer language, and we'll mark this as Exhibit 7 to
19  your deposition.
20             (Deposition Exhibit No. 7
21             (marked for identification.
22       A.  Yes.
23       Q.  (BY MR CARRERA) Okay.  Now, would you
24  consider the documents shown as Exhibit 5 to be part
25  of the subcontract agreement between Peacock
```

**41**

```
1   Construction Company and South Texas Masonry?
2        A.  No.
3        Q.  Why not, sir?
4        A.  It's a letter of transmittal.
5        Q.  Okay.  It's a letter that they send the
6   subcontract to South Texas Masonry?
7        A.  Uh-huh.  Yes.
8        Q.  And it talks about, also note that a list of
9   items are requested to be returned along with the
10  signed subcontracts, and all paperwork must be
11  received by our office prior to starting any work.  It
12  says that, correct?
13       A.  It does, yes.
14       Q.  And it gives a list.  And number one, it
15  says, workers' compensation and general liability
16  insurance certificates.
17       A.  Yes.
18       Q.  It says, proof of insurance.  If you do not
19  have workers' compensation insurance we require that
20  you fill out the attached TWCC-83 form, otherwise
21  dispose of said form.
22             Did I read that correctly?
23       A.  I believe so.
24       Q.  Okay.  Now, you don't feel that the sample
25  certificate for commercial general liability insurance
```

11 (Pages 38 to 41)

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

**46**

1  any insurance, including workers' compensation and
2  general liability, required by the contract documents,
3  from a responsible insurer, and shall furnish
4  satisfactory evidence to the contractor that the
5  subcontractor has complied with these requirements.
6  Subcontractor's insurance coverage -- subcontractor's
7  insurance will be considered as primary.
8         Did I read that correctly?
9    A.  I believe so.
10   Q.  Subcontractor being South Texas Masonry and
11  contractor being Peacock.  Correct?
12   A.  Yes.
13   Q.  Now, you're --
14   A.  It's -- I'm absolutely convinced that that's
15  right.  There may be some other subcontractors
16  involved, but I don't know about them.  I figure the
17  crane company was, and that -- that actually is
18  relevant to something else.
19   Q.  But for purposes of Exhibit 4, subcontractor
20  refers to South Texas Masonry?
21   A.  Exhibit 4?  For now, yes.
22   Q.  Now, you're saying 6.1 does not require
23  South Texas Masonry to obtain commercial general
24  liability coverage?
25   A.  Even for itself.

**47**

1    Q.  Why do you say that, sir?
2    A.  Okay.  If you read the language, the
3  language is actually pretty clear.  Starting to --
4  prior to starting work, subcontractor shall obtain any
5  insurance required by the contract documents.  And --
6  okay? -- if they are required by the contract
7  documents that will include workers' compensation and
8  general liability.  And blah, blah, blah.
9  insurer.  And blah, blah, blah.
10        Now, the issue -- the real issue here
11  is this -- the function of the word "including."
12  Right?  Prior to starting work, the -- the
13  subcontractor shall obtain any insurance.  Then if it
14  said, and some of the insurance it must buy is
15  workers' comp and general liability, plus there might
16  be some more -- right? -- look elsewhere in the
17  contract documents to see if it's required, then
18  everything would be working out fine.  But what this
19  says is, prior to starting work the subcontractor
20  shall obtain any insurance required by the contract
21  documents.  Now, does -- are there any requirements in
22  here that it is clear from the contract that that
23  requirement, when it exists, whatever it is, applies
24  to comp and general liability, but there is nothing
25  here that says it does.

**48**

1    Q.  Well, let's go back to what you refer to as
2  the transmittal letter, which is Exhibit 5.
3    A.  Right.
4    Q.  It talks about, page one, all paperwork must
5  be received by our office prior to starting any work,
6  and they talk about certificates of workers'
7  compensation and general liability insurance, do they
8  not?
9    A.  Yes, they do.
10   Q.  But you feel that in combination,
11  subcontract agreement, Exhibit 4, and the transmittal
12  letter, Exhibit 5, don't require the purchase of a
13  commercial general liability policy by South Texas
14  Masonry?
15   A.  The contract doesn't.  I mean, in fact, the
16  way this is worded, it says, if you don't have
17  workers' comp insurance, we require that you fill out
18  W -- TWCC-83, which sounds like that you don't have to
19  buy workers' compensation.  What you have to do is to
20  fill out TWCC-83.
21   Q.  But we're not talking here about workers'
22  compensation.  Okay?
23   A.  I understand.
24   Q.  At least not for now.  Let's talk about
25  commercial general liability insurance.

**49**

1    A.  Right.
2    Q.  You're saying that taken together, the
3  subcontract agreement, paragraph 6.1 thereof, and the
4  transmittal letter, paragraph one, don't require South
5  Texas Masonry to obtain a commercial general liability
6  insurance policy prior to commencing work?
7    A.  Well, actually, what I've said is that the
8  contract doesn't require it.  Okay?  What the -- what
9  the letter of transmittal clearly says to anybody who
10  knows anything about the construction business is,
11  we're not going to let you on the site until we have
12  a -- until we have a certificate of insurance.  I
13  mean, so it's perfectly consistent to -- for the
14  contract to fail to do it and for you to say, look,
15  until you've got insurance, you can't work.  Okay.
16   Q.  Okay.
17   A.  I mean, you know, there is nothing
18  inconsistent about that.
19   Q.  In fact --
20   A.  I mean, in fact, it's -- something like that
21  is almost always -- we want the certificate before you
22  show up.
23   Q.  The subcontract agreement is dated
24  January 10 of 2002.  Correct?
25   A.  Yes.

13 (Pages 46 to 49)

Wright Watson & Associates, L.L.C.
(512) 474-4363

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

54

1    Q.   The actual insurer was Hartford Lloyds
2  Insurance Company. Correct?
3    A.   True. The second thing is, is that this --
4  I don't see a policy number on here.
5    Q.   It says, TBD under policy number. Would you
6  understand that under the terminology to be, to be
7  determined or --
8    A.   That is what it I would expect it to mean,
9  yes. But I've -- I'm not sure I've ever seen that
10  before. And it's -- that is extremely rare. It also
11  says that -- that the policy has expired, which --
12  which I don't believe this has.
13    Q.   Where does it say the policy is expired?
14    A.   (Indicating).
15    Q.   It says --
16    A.   Oh, I'm sorry. It's 12-1-02. No, no, no.
17  I take that back.
18    Q.   Okay. Okay.
19    A.   So it all has to do with -- I mean, it's --
20  they've named the wrong insurer and they haven't given
21  the policy number. There is other -- there is other
22  ones in here where the policy number is given.
23    Q.   What you're saying is, there are later
24  certificates where the policy number is indicated?
25    A.   Yes.

55

1    Q.   In any event --
2    A.   I don't remember whether they're later or
3  not, but I would be surprised if they're not.
4    Q.   The document I showed you is part of Bartram
5  Exhibit 1, four pages, before the end it says, the
6  Hartford intercom submission recap indicates that
7  there was a commercial general liability policy in
8  effect as of December 1, 2001, for a one-year period.
9  Correct?
10    A.   Yes, it does say that.
11    Q.   Okay. The fact that the incorrect
12  underwriter is designated here in the certificate as
13  Hartford Casualty Insurance Company as opposed to
14  Hartford Lloyds Insurance Company, does that have any
15  bearing on your opinions as to whether or not Peacock
16  would be an additional insured under the policy?
17    A.   If the certificate of liability insurance
18  actually constituted part of the policy and conveyed
19  rights, I would say, yes. But since it doesn't do
20  that, nothing really matters.
21    Q.   Okay. And you're presupposing my other
22  question. If the lack of a policy number on the
23  certificate, does that affect your opinion one way or
24  the other?
25    A.   Well, what you have in both of those cases

56

1  is messiness. And I mean, if -- in a -- in a sort of
2  contracted lawsuit of -- where there were -- where
3  those are the key issues, you would have to have
4  pleadings and proof and so on. The -- that would tend
5  to happen only if the certificate of liability
6  insurance actually worked to -- to constitute some
7  sort of authoritative designation. In other words, it
8  performed a job under the policy and -- and conveyed
9  rights, which it doesn't do.
10    Q.   Okay. So if this certificate of liability
11  insurance issued were dated January the 15th of 2002,
12  had designated the policy number and the insurers at
13  Hartford Lloyds Insurance Company, it wouldn't make
14  any difference because it confers no substantive
15  rights?
16    A.   Right. That's right. That's my view.
17    Q.   And why is it your opinion that it confers
18  no substantive rights?
19    A.   Because of the standardized message that's
20  occurred at the top right, right under the title of
21  the thing. The ACORD document here is used in
22  thousands of cases all over the country. And everyone
23  I've ever seen says either this or something like it:
24  To wit, this certificate is issued as a matter of
25  information only and confers no rights upon the

57

1  certificate holder. The certificate does not amend,
2  extend or alter the coverage afforded by the policies
3  below. Now, there is no policy below. I mean, yeah,
4  that's it -- that is something that is bothersome,
5  conceptually bothersome and theoretically bothersome
6  and all like that, but let's suppose it's not a
7  problem. Let's suppose it's Hartford Lloyds. Then
8  this, Exhibit 9 to my deposition, doesn't change the
9  policy itself one iota. It -- there's either coverage
10  in the policy or there isn't. Now, there might be
11  something to complain about here, on the part of
12  the -- on the part of Peacock, but it's not going to
13  come under the policy.
14    Q.   Who would the complaint be against?
15    A.   It would -- it seems to me it would be
16  against the -- the intermediary.
17    Q.   McQueary, Henry, Bowles & Troy?
18    A.   Yes. But I've got to tell you that I have
19  not seen any agreements about this, and I would not
20  try to portray what I've just said as a thought-out,
21  balanced, rooted opinion. Because I haven't been
22  provided stuff in order to -- I mean, I'm -- I'm
23  capable of doing that, but not here, not now, not yet.
24    MR. CARRERA:  Let me just object to the
25  last portion as not responsive.

15 (Pages 54 to 57)

Wright Watson & Associates, L.L.C.
(512) 474-4363

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

---

62

1    A.   Yes.  Yes, that's right.  Now, I doubt
2    that -- I doubt that the words additional insured are
3    required.  I mean, it could be just -- it -- somebody
4    could have written Peacock here in the -- in the
5    margin, and as long as that was an authoritative
6    thing, it might have worked.  I mean, I don't know.  I
7    would have to take a look at it.
8    Q.   What about if there is a prior course of
9    dealing between the parties, in this case, South Texas
10   Masonry and Peacock, whereby Peacock obtains
11   certificates of insurance designated as an additional
12   insured for quite some time?
13   A.   Okay.  Okay.  So the -- the question would
14   be, would the true proposition, we've always done it
15   that way, imply that that was intended under this
16   contract?  I don't think so.
17   Q.   So if Peacock and South Texas Masonry had
18   done it that way before where Peacock says, you're
19   going to name me as an additional insured on your
20   certificates, that's not going to do the trick?
21   A.   I'm sorry.  That --
22   Q.   If they have a prior course of dealing --
23   A.   If they have a prior course of dealing
24   whereby -- whereby Peacock is an insured under the
25   policy?

---

63

1    Q.   Whereby South Texas Masonry has provided
2    Peacock with certificates of insurance which designate
3    it as an additional insured?
4    A.   Oh, I shouldn't think so.  I mean, the
5    problem there is "designate."  I mean, if -- if, for
6    example, this form contract is what they've used
7    together for years and various certificates of
8    insurance have been issued and issued and issued and
9    issued and there have never been any claims, there
10   is -- there is business and possibly legal problems
11   here, but that wouldn't establish that -- that Peacock
12   was ever an additional insured under any of the
13   policies.
14   Q.   Okay.  So --
15   A.   I mean, somebody is not paying attention,
16   that's for sure.
17   Q.   In essence, what you're saying is there is
18   poor draftsmanship of this subcontract agreement?
19   A.   Yes, I am saying that.  I mean, whoever
20   drafted this needs to be taken out and hanged.  Now,
21   that's a metaphor, you understand.
22        MR. WEATHERED:   I'm going to object to
23   the responsiveness.
24        THE WITNESS:   I can't blame you.  It
25   was intended to be a metaphor, but you should have

---

64

1    seen his face.  My Lord, I wish we had had that one on
2    TV.
3    A.   Yeah, I think whoever drafted the contract
4    didn't do a very good job.
5    Q.   (BY MR. CARRERA)  So even the parties --
6    though the parties may have intended for Peacock to be
7    an additional insured under the South Texas Masonry
8    commercial general liability policy, the subcontract
9    agreement and the subparagraphs under Insurance there
10   under Article 6, do not do the trick?
11   A.   That's right.  I mean, "intended" is a
12   problematic word here.  I mean, if they wanted it to
13   happen, given the language they had, they didn't get
14   what they wanted in the language that they had.  In
15   which case, their -- their desires were not fulfilled
16   by the language they subscribed to.  Which is not
17   unheard of in contract situations.  It's unfortunate
18   when it happens, but it's not unheard of.  So they
19   didn't get what they wanted if that is -- if that is,
20   in fact, what they wanted.  Now, I've been involved in
21   so many negotiations like this that sometimes people
22   say, we want this, and they don't really.  And so I
23   don't know what they wanted, and so on.
24   Q.   Let's talk about -- strike that.
25        Is there any commercial general

---

65

1    liability policy -- or standard form commercial
2    general liability policy that would provide coverage
3    to Peacock under the subcontract agreement with South
4    Texas Masonry?
5    A.   Sure.  It would be very easy to do that.
6    Q.   Well, I'm talking about under this language
7    as it exists.
8    A.   Yes.  It would be very easy to do.
9    Q.   Well, I'm not trying to ask you to amend the
10   subcontract at this point.
11   A.   I know.
12   Q.   I'm trying to say --
13   A.   I understand.
14   Q.   Okay.  So how would you do that?
15   A.   I would name them in the -- in the
16   declarations page.
17   Q.   Okay.  That's were we're talking about
18   subparagraph f?
19   A.   Huh-uh.
20   Q.   Towards the bottom?
21   A.   No.
22   Q.   Well, before you say no, let me let you read
23   it, where it says, coverage under this provision does
24   not apply to 3, to any other person or organization
25   shown in the declarations as an additional insured.

17 (Pages 62 to 65)

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

70

1 you a trivial example. You could -- you could do it
2 this way. You could say, every company that does
3 business with us whose name begins with P is an
4 additional insured. You put it on the dec page, the
5 insurance company issues it, that's it. Everybody who
6 whose name -- whose name begins with P who is involved
7 in the deal gets insurance. I mean, not -- I've given
8 you an imaginative example. That's not -- I've never
9 seen it, but I'm just trying to point out to you that
10 there are different ways to get to the same thing.
11    Q.  But as a general proposition, there is only
12 two ways. Specific inclusion, or inclusion under a
13 paragraph such as subparagraph f?
14    A.  Those are certainly two ways to do it. And
15 they're -- they are the ways that are usually done,
16 yes.
17    Q.  Okay. Now, is that -- when you talk
18 about -- I'm going back to your report here.
19    A.  Uh-huh.
20    Q.  Page 13, the second paragraph there on the
21 bottom. Let us suppose that STM, South Texas Masonry,
22 is required by the contract to buy some liability
23 coverage or other. There is nothing explicit in the
24 language of Article 6.1 which amounts to or entails
25 buy some for PCCI, which is Peacock.

71

1         And I think what you're saying is,
2 again, there is no specificity either that the
3 commercial general liability insurance policy
4 specifically name Peacock or designate Peacock as an
5 additional insured?
6    A.  I -- yes.
7    Q.  And you continue to quote a case out of the
8 Corpus Christi Court of Appeals called PG Bell Company
9 versus United States Fidelity and Guaranty Company,
10 found at 853 S.W.2d 187. And you quote, it says, the
11 requirement that a subcontractor purchase general
12 liability insurance before working on the job does
13 not, without more, make the general contractor a third
14 party beneficiary of the insurance contract.
15    A.  Yes.
16    Q.  Okay. And so what you're saying here is
17 that even if the subcontract agreement in this case
18 specifically called for South Texas Masonry to
19 purchase general liability insurance before starting,
20 that in of itself would not necessarily make Peacock a
21 third party beneficiary?
22    A.  I believe that's right. If I -- I think I
23 understood you, and...
24    Q.  Okay.
25    A.  I mean, what you said was is if they were

72

1 required to buy liability insurance for themselves, it
2 would not make -- if -- if South Texas Masonry were
3 required by the contract to buy liability insurance
4 from itself -- for itself, that would not make Peacock
5 a third party beneficiary under that contract. The
6 answer to that -- if that's the question, the answer
7 is yes.
8    Q.  And the reason I phrased it that way is
9 because you've opined that you don't even think that
10 the subcontract agreement calls for South Texas
11 Masonry to buy commercial general liability insurance.
12    A.  It's true.
13    Q.  Okay.
14    A.  I believe it doesn't do that. But they
15 already had it.
16    Q.  Okay. Let's go to the next page, 14, number
17 one. And I'm going read this in its entirety because
18 it's not that long. It says, given the language of
19 the contract between South -- South Texas Masonry and
20 Peacock, the latter did not become an additional
21 insured under the Hartford Lloyds Insurance, slash,
22 South Texas Masonry policy. The contract did not
23 contain the mandate or the directions. If such was
24 intended, as it were, almost automatically, under the
25 circumstances of this type situation or case, the

73

1 relevant sections of the contract were poorly drafted.
2 If not, then the Peacock-South Texas Masonry deal was
3 poorly documented. The written document -- contract,
4 agreement or permit -- does not mandate coverage. And
5 you cite a case -- a couple of cases, Continental
6 Casualty Company versus Fina Oil & Chemical Company,
7 and A.F. Lusi Construction versus Peerless Insurance
8 Company out of Rhode Island.
9         I have read that, but I think we've
10 already, in essence, talked about that. Correct?
11    A.  Yes.
12    Q.  Let's go to paragraph two. It says, in the
13 alternative, if Peacock became an additional insured
14 under the policy, the trigger language is simply not
15 met. The lifting and moving of the rebar by the crane
16 does not appear to have been the work of South Texas
17 Masonry, nor was it part of South Texas Masonry's
18 operation.
19         So what are we talking about there?
20    A.  I asked what happened. I -- my source on
21 this is Barker. I asked him what happened. And he
22 said that for some reason or another, Peacock wanted
23 to move rebar, which STM was -- which belonged to STM,
24 and which they were going to be using the next day or
25 day after, or some such thing like that. And that

**Wright Watson & Associates, L.L.C.**
**(512) 474-4363**

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

**78**

1  of action for bodily injury or death to employees of
2  the subcontractor who may or may not be acting in the
3  course and scope of their employment at the time of
4  their bodily injury or death which occurs in
5  connection with or involves in any manner
6  subcontractor's or subcontractor's agents' employees',
7  invitees', performance of work or service under this
8  contract, regardless of whether or not such claims or
9  alleged acts or omissions are caused in whole or in
10  part, open parentheses, or are alleged to be caused in
11  whole or in part, close parentheses, by any negligence
12  on the part of the contractor.
13         Did I read at that correctly?
14     **A. I didn't hear any mistakes.**
15     Q.  6.4:  It is -- it is the specific intent of
16  the parties to this contract that the subcontractor is
17  agreeing to indemnify the contractor for the effects
18  of the general contractor's, its agents' and
19  employees' own negligence or other wrongful conduct.
20         Did I read that correctly?
21     **A. You did.**
22     Q.  Now, let me see if I understand this
23  correctly.  That even if Peacock is not an additional
24  insured under the general liability contract, the
25  commercial general liability contract, that there

**79**

1  still may be coverage to Peacock under an indemnity
2  provision found within the subcontract agreement
3  between Peacock and South Texas Masonry?
4     **A. Yes. Policies are usually built like that.**
5         MR. WEATHERED:  I'm sorry.  I couldn't
6  hear the answer.
7         THE WITNESS:  I'm sorry.  Policies are
8  usually built like that.
9     Q.  (BY MR. CARRERA)  Which provision of the
10  policy calls for coverage based on an indemnification
11  provision?
12     **A. All right. The coverage is under A.1.A, we
13  will pay on behalf of the insured those sums which the
14  insured becomes legally obligated to pay as damages
15  because of bodily injury, to which this insurance
16  applies.**
17     Q.  And what page are we looking at?
18     **A. We're on page one of 21.**
19     Q.  Okay.
20     **A. And I believe that -- then if you go to B --
21  B.1.B.**
22     Q.  Contractual liability, on page four?
23     **A. Yes. This exclusion does not apply to
24  liability for damages because of.  Bodily injury
25  assumed in a contract or agreement that is an insured**

**80**

1  **contract providing -- provided the bodily occurs
2  subsequent to, blah, blah, blah. And then the
3  definition of an insured contract is in -- is in the
4  defining section, and if I'm remembering it
5  correctly -- I didn't look at it very carefully this
6  time around -- it would be alphabetical and it would
7  be under insured contract.**
8     Q.  Try page 19.
9     **A. Yeah.**
10     Q.  Paragraph ten.
11     **A. Under insured contract -- it would be F, I
12  believe.**
13     Q.  And --
14     **A. That's where you have assumed the liability
15  for another party to pay for bodily injury to a third
16  person.**
17     Q.  Okay.
18     **A. I think that's how it would work.**
19     Q.  And just to make this clear.  Let's assume
20  that you are correct in your analysis that -- and
21  Hartford Lloyds Insurance Company is correct in its
22  analysis that under the subcontract agreement between
23  Peacock and South Texas Masonry, under the transmittal
24  letter which sends out the sample certificate, and the
25  terms of the sample certificate and even the actual

**81**

1  certificate that were issued, designating Peacock as
2  an additional insured, even if you and Hartford Lloyds
3  Insurance Company are correct that none of those
4  documents singularly or put together are sufficient to
5  designate Peacock as an additional insured under the
6  commercial general liability policy, that if there is
7  a valid indemnity provision within the subcontract
8  agreement, there would still be coverage under the
9  policy for Peacock?
10     **A. Yes. Where "valid indemnity agreement" is
11  that it conforms to state law and conforms to the
12  requirement of the policy with respect to valid
13  indemnity agreements.**
14     Q.  Okay.  And you're saying that the
15  indemnification requirements of Texas law which are
16  built into and presupposed by insurance contract are
17  not met by the Peacock-South Texas Masonry contract?
18     **A. I don't think so.**
19     Q.  Why not?
20     **A. Well, it looks like to me, what I've done
21  here is to say, 6.4 is -- is intended to be an
22  explanation of 6.3. And thus, what we're looking at
23  is the language of 6.3. Okay? And it looks like to
24  me that there are several problems with 6.3, one of
25  which is that it says, we will -- we will indemnify,**

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

---

**86**

1  is no negligence on the part of the -- the contractor
2  is indemnified even when it's not negligent.
3    Q.  Where does it say that the contractor is not
4  indemnified when it is not negligent?
5    A.  No.  It is indemnified when it's not
6  negligent.
7    Q.  Where does it say that?
8    A.  Okay.  Right here.  Regardless of whether or
9  not such claims.  Okay?  All these claims -- there is
10  indemnity for all these claims.  Regardless of whether
11  or not these claims or alleged acts -- of acts or
12  omissions are caused in whole or in part.  Okay?  Or
13  are alleged to be caused in whole or in part.  In
14  other words, if there is an allegation of negligence,
15  there is indemnity no matter what.  In other words,
16  there is indemnity -- there is indemnification even --
17  so long as you -- you make a claim based on
18  negligence, even if the liability is not based on
19  negligence.
20    Q.  You know, I still don't understand where
21  you're coming from because, to me, I can read that as
22  negligence can be concurrent between the contractor
23  and some other tortfeasor.
24    A.  Sure.
25    Q.  Did you read the pleadings in the underlying

---

**87**

1  lawsuit in this case?
2    A.  I -- I believe so.  At least some of them.
3  I don't know whether I read them all because, you
4  know, pleadings get amended.
5    Q.  And the -- the allegation was that Peacock's
6  negligence caused the crane to collapse?
7    A.  No question about it.
8    Q.  And there is also an allegation that South
9  Texas -- excuse me.  That the crane company --
10    A.  Crane company, yeah.  I don't care anything
11  about that.  That's fine.  No problem.
12    Q.  Consolidated Crane Company was also
13  negligent.  Correct?
14    A.  No problem with that.  None at all.  If --
15  if Peacock -- if Peacock -- if they're both negligent,
16  then if there is a valid indemnity agreement and --
17  and everything else is satisfied, then the indemnity
18  agreement would be triggered -- be triggered with
19  respect to Peacock.
20    Q.  Okay.  And let's go again to 6.4 now, which
21  you say is, in your opinion, intended to somehow
22  explain 6.3?
23    A.  Well, there is two ways to read it.  Either
24  6.4 is designed to be somehow or another to kind of
25  give everybody the drift of -- of 6.3, which it

---

**88**

1  doesn't do, or it's independent of it.  In which case,
2  it says there is indemnity for negligence.  That's
3  fine.  There is indemnity for negligence, but there is
4  nothing said here in 6.4 that there is no indemnity
5  for non-negligent wrongful conduct.  Okay?  And if
6  there -- if under 6.3, there is -- if you read these
7  together, there is an indemnification for defective
8  conduct on the part of Peacock which is not negligent,
9  then it would seem to me if you take the two of them
10  together, neither of them -- then they as a unit don't
11  survive.
12    Q.  Well, let's read 6.4 again.
13    A.  Okay.
14    Q.  It is the specific intent of the parties to
15  this contract that the subcontractor is agreeing to
16  indemnify the contractor for the effects of the
17  general contractor's, its agents' and employees' own
18  negligence or other wrongful conduct.
19      Okay.  Now, you're saying that while
20  this is clearer with regard to indemnification of the
21  contractor, Peacock, for its own negligence, that
22  because you interpret 6.3 as indemnifying Peacock not
23  just for its own negligence but for other types of
24  claims, that they can't be read together?
25    A.  No.  My -- my claim is they have to be read

---

**89**

1  together.  And if they're read together and if -- and
2  if my reading of the last several lines of 6.3 is
3  correct, then the indemnity fails under the usual
4  express negligence rule.  By the way, if you read four
5  by itself without any reference to three, then you
6  have -- you have South Texas Masonry indemnifying --
7  indemnifying Peacock for projects upon which it's not
8  working, that is to say, "it" being South Texas
9  Masonry.
10    Q.  You said four.  You mean 6.4?
11    A.  Yes, I just -- that's what I -- that's what
12  I meant.
13    Q.  What do you understand the express
14  negligence rule to be?
15    A.  Well, the -- if I have understood it
16  correctly, it is that a subcontractor, as applied to
17  situations like this, a subcontractor can indemnify a
18  contractor for the contractor's negligence in
19  conjunction with stuff that happens in connection with
20  the subcontractor.  And only for negligence.
21    Q.  Now, you have opined that 6.4 can be
22  construed in such a manner that South Texas Masonry
23  would be indemnifying Peacock even on projects not
24  related to the Las Dunas project on South Padre
25  Island?

**Wright Watson & Associates, L.L.C.**
**(512) 474-4363**

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

94

1    Q.   Well, it -- in this case, the underlying
2    facts -- strike that.
3         The parenthetical in the middle of 6.3,
4    says, including claims or causes of action for bodily
5    injury or death to employees of the subcontractor who
6    may or may not be acting in the course and scope of
7    their employment at the time of their bodily injury or
8    death which occurs in connection with or involves in
9    any manner subcontractor's or subcontractor's agents'
10   employees', invitees', performance of work or service
11   under this contract, regardless of whether or not such
12   claims or alleged acts or omissions are caused in
13   whole or in part (or are alleged to be caused in whole
14   or in part) by any negligence on the part of the
15   contractor.
16        Now, I understand that to read that
17   South Texas Masonry -- or that the intent of this
18   paragraph is to -- for South Texas Masonry to
19   indemnify Peacock for personal injury or death even to
20   Peacock's -- even to South Texas Masonry's employees,
21   whether or not they were acting in the course and
22   scope of their employment with South Texas Masonry at
23   the time of their injury or death.
24        **A.   I believe that's one of the things it's**
25   **trying to do, yeah.**

95

1    Q.   And it also talks about performance of work
2    or service, quotes, under this contract, close quotes,
3    does it not?
4    **A.   Yes.**
5    Q.   Okay.
6    **A.   Let's see.  Which occur -- okay.**
7    **Where the -- for indemnity, all losses, liabilities,**
8    **which occur in connection with -- which occur in**
9    **connection with or involving in any manner**
10   **subcontractor's performance of work or, I suppose, the**
11   **subcontractor's agents' employees', invitees',**
12   **performance of work or service under the contract.**
13   Q.   Okay.  And you understand --
14   **A.   I mean, I -- what I've just done is to read**
15   **the -- the repetition of subcontractors so that it --**
16   **so that it's not simply -- I mean, you're talking**
17   **about the subcontractor's work and you're talking**
18   **about the performance of work by the subcontractor's**
19   **agents.**
20   Q.   The point I'm trying to make is that that
21   indemnification agreement in paragraph 6.3 appears to
22   be limited to work done in connection with the
23   subcontract agreement.
24        MR. WEATHERED:  Objection.  Form.
25        MR. CARRERA:  Basis, Mr. Weathered?

96

1         MR. WEATHERED:  Victor, I'm not trying
2    to lump behind a log here.  The problem I'm having,
3    and I don't -- I don't -- I'm not meaning to imply
4    that you're doing this intentionally, but sometimes
5    you -- you preface your question that you make it a
6    statement that it's your understanding and that this
7    is the way that you read it.  And I don't want to be
8    in a position of -- of waiving an objection to, you
9    know, letting counsel basically testify to the court
10   or to the jury.
11        MR. CARRERA:  The document speaks for
12   itself, Mr. Weathered.  Okay?
13        MR. WEATHERED:  I agree.
14   Q.   (BY MR. CARRERA)  And let me -- let me
15   rephrase -- okay.
16   **A.   It would be --**
17        MR. WEATHERED:  I think you can
18   probably cure, you know, my concerns just by
19   rephrasing, Victor.
20   Q.   (BY MR. CARRERA)  In question to you,
21   Mr. Quinn, is -- is simple.  Do you understand that
22   paragraph 6.3 to be an attempt to have South Texas
23   Masonry indemnify Peacock for personal injury or death
24   which may arise solely out of Peacock -- South Texas
25   Masonry's service under the subcontract agreement?

97

1    **A.   I don't think so.**
2    Q.   You don't see that the terms, quotes, under
3    this contract, close quotes, limit it in any way?
4    **A.   Well, if it's indemnifying -- if it's**
5    **indemnifying Peacock for conduct or performances that**
6    **have solely to do with South Texas Masonry, we could**
7    **not possibly be indemnifying them for their**
8    **negligence, because they've got nothing to do with it.**
9    **Only South Texas Masonry would have to do with it in**
10   **that case.  So it couldn't be doing -- doing it for**
11   **that, if I've understood what you're driving at.**
12   Q.   You're saying that a Peacock employee can't
13   be negligent and injure a South Texas Masonry employee
14   while the South Texas Masonry employee is doing work
15   on the project?
16   **A.   I'm sorry.  I did -- I did miss what you**
17   **were driving at.  I thought you were driving --**
18   **driving at a situation in which only South Texas**
19   **Masonry was -- was negligent.**
20   Q.   No.  I didn't mention South Texas Masonry's
21   negligence at all.  I'm talking about Peacock's
22   negligence.
23   **A.   Well, I misunderstood you.**
24   Q.   Okay.  And what I'm trying to say is that --
25   **A.   All right.  Now, is one of the intended**

25 (Pages 94 to 97)

**Wright Watson & Associates, L.L.C.**
**(512) 474-4363**

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

102

1  subcontract agreement?
2      A.  The contract is too short for almost
3  anything to be inconspicuous. If they -- if by that
4  what we -- what you mean is, is that it's hard to
5  find. But, no, I don't think so. I think it's easy
6  find, just hard to understand.
7      Q.  Okay.
8      A.  If at all.
9      Q.  So you would disagree with the determination
10  by Ms. Kaechler of Hartford Lloyds Insurance Company
11  that the indemnity language of the subcontract
12  agreement is inconspicuous?
13      A.  Well, if -- if by con -- if by inconspicuous
14  she meant you can't find it, if that's what she meant,
15  I don't think that's right. I think you can find it.
16  If she meant that it's so complicated you can't
17  find -- you can't find something that works, I -- I
18  mean, then I guess I would agree with her. I don't
19  use the word conspicuous very much, except for people
20  who are, you know, real tall.
21      Q.  In any event, it is a short contract, four
22  pages?
23      A.  Yes.
24      Q.  And --
25      A.  Well, that part of it is, yeah. I mean,

103

1  there is a whole lot of other stuff, but I -- I have
2  been told that none of the rest of it has to do with
3  this, so I assume that's right.
4      Q.  And it was signed by -- I believe that's the
5  signature of Mr. Baldemar Salazar, on the behalf of
6  South Texas Masonry?
7      A.  I guess. I mean, I've -- you know, you ask
8  me, is that Baldemar's signature. I don't know.
9      Q.  But I assume --
10      A.  But I mean, nobody has -- nobody has fussed
11  about this. I mean, I've -- I've inferred that maybe
12  one of the -- the fellow that got killed is his
13  brother or related to him somehow or another. I mean,
14  that's very sad business, but that's -- I haven't
15  given it any more thought.
16      Q.  Let me represent to you, they were not
17  related.
18      A.  Oh, good. I'm so glad to hear that.
19      Q.  Salazar is a very common surname in south
20  Texas.
21      A.  Oh, that's what I didn't know.
22          Now, let me ask you a question. Do you
23  really think that's Peacock's signature?
24      Q.  The beauty of the deposition process, even
25  though I've violated it already, is that I don't have

104

1  to answer questions, and you as an attorney should
2  know that.
3      A.  Oh, my goodness. I forgot all about that.
4          MR. CARRERA: It's getting to be late
5  Friday afternoon, Mr. Weathered, so bear with us.
6          Can you mark this as the next exhibit,
7  please.
8          (Deposition Exhibit No. 10
9          (marked for identification.
10      Q.  (BY MR. CARRERA) I'm going show you a
11  document that's marked Exhibit 10 and ask you if
12  you've seen that before. And I'm sure you've seen the
13  last four pages, which is it the contract agreement.
14      A.  Yeah. I -- I simply can't remember whether
15  I've seen the signature page or not. It would -- it
16  would surprise me if I have not, but I don't remember
17  it.
18      Q.  The last four pages of this exhibit are the
19  subcontract agreement we've been talking about which
20  has been marked as Exhibit 4 to your deposition.
21  Correct?
22      A.  I believe so. Mr. Peacock's signature
23  certainly is the same.
24      Q.  And the second page is what I'm --
25      A.  Yes. The handwritten thing here that says,

105

1  South Texas Masonry on it?
2      Q.  Yes. It's a transmittal -- facsimile
3  transmittal sheet from Arturo Salazar to South Texas
4  Masonry?
5      A.  Yes, that's what it says.
6      Q.  And it's to Ms. Nancy Kaechler, and it's
7  dated March 11th of 2003?
8      A.  It's to Kaechler, yes. Which I assume is
9  Nancy. Nobody is named Kaechler except for Nancy.
10  Okay.
11      Q.  And it's very short notes and comments on
12  there. It says, the following is the contract we
13  signed prior to commencing work at the Las Dunas
14  Condominiums in South Padre Island. If you have any
15  questions, please don't hesitate to call me at
16  (956)782-6286. And it's presumably signed by
17  Arturo Salazar.
18          Did I read that correctly?
19      A.  I believe so.
20      Q.  Okay. So at least, from this transmittal
21  letter, it's clear that South Texas Masonry retained a
22  copy of the subcontract agreement and that they
23  actually signed it prior to commencing the work at the
24  Las Dunas project?
25      A.  The latter of those two propositions is

27 (Pages 102 to 105)

Peacock Construcción, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

### 110

1 that the indemnity provisions in this four-page
2 contract are hard to find?
3    A.  No, I don't think they're hard to find.
4 They're hard to understand, but they're not hard to
5 find.
6    Q.  Again, Exhibit 12 is a letter dated
7 August 27, 2003, from Ms. Kaechler to Cary Toland, who
8 was Peacock's, then, attorney.  And she says that
9 based upon review of plaintiff's third amended
10 petition, Hartford Lloyds Insurance Company remains
11 the same, that Peacock is not an additional insured
12 under the South Texas Masonry policy.
13    A.  Okay.  In other words, the amending of the
14 pleading hasn't changed her view.
15    Q.  Exhibit 13 is Ms. Kaechler's response to
16 Ruben Pena's letter, which we referred to earlier,
17 which is Exhibit 6 to your deposition.  And in this
18 one she adds an additional reason being that, in her
19 opinion, that the injuries to Mr. Corral and to
20 Mr. Gracia and the death of Mr. Jose Salazar did not
21 arise out of the -- South Texas's work.
22    A.  I understand that.
23    Q.  And you agree with her assessment in that
24 regard?
25    A.  I don't know.  I mean, if I -- I have based

### 111

1 it on the assumption that these guys were leaving for
2 the day.  And I believe that if they were leaving for
3 the day, the work was over.  I could be talked out of
4 that.  I mean, I could very, very well imagine that a
5 business had a custom that your work wasn't over until
6 you left -- until you left the grounds.  Or I could
7 very well imagine that the custom at a business was
8 when you're done, you're done.
9    Q.  Would the fact that workers' compensation
10 benefits were paid to the injured party and to the
11 beneficiaries of the deceased --
12    A.  It's relevant, yeah.
13    Q.  Would that be relevant to whether they were
14 considered to be in the course and scope of their
15 employment with South Texas Masonry at the time of
16 their injury -- at the time of this incident?
17    A.  I think so.  The reason I hesitated is that
18 I remembered a bunch of cases when I was doing a lot
19 of this sort of thing in which people driving from one
20 place to another was an issue.  And my recollection
21 was is that if you -- if you had -- once you've left
22 the plant and you were driving home, it was over.  On
23 the other hand, if you're making a delivery, it wasn't
24 over.  And, frankly, I don't remember ever seeing a
25 case where a workers' comp was denied on the basis of

### 112

1 the fact that somebody was leaving the plant.  I mean,
2 you know, a slip and fall would be enough to trigger
3 workers' comp, as I remember.
4    Q.  So --
5    A.  But there is also a sense in which that's
6 not part of the work.  I mean, you're done.  You're
7 just leaving the plant.  So I'm not sure what the
8 answer would be.
9    Q.  So in your report when you talk about
10 another basis for exclusion being that the injury to
11 Remedios Corral -- the injuries to Remedios Corral and
12 Jose Gracia, and also the death of Jose Guadalupe
13 Salazar, were not related to South Texas Masonry's
14 work, you're not -- you're not a hundred percent sure
15 on that?
16    A.  That's right.  That's right.  Well, I mean,
17 they weren't working.  They were leaving.  Now, what
18 do I want to say about whether that was part of the
19 job.  Well, it is part of the job.  You have to go
20 home at night.  You have to arrive in the morning.
21 But were they performing work?  No, I don't think so.
22    Q.  But what is undisputed is that they -- two
23 things are undisputed.  Number one, they were at the
24 location because of the work that South Texas Masonry
25 was doing for Peacock.  That's undisputed.  Correct?

### 113

1    A.  Yes.
2    Q.  And number two, that they have been paid or
3 their -- the beneficiaries of Mr. Salazar have been
4 paid workers' compensation benefits as a result of the
5 injury they received?
6    A.  I didn't know that.  But I hadn't thought
7 about it.  I believe it, yeah.
8    Q.  Okay.  If there's document --
9    A.  The problem here is that this falls under
10 definition 22.A.  I mean, "your work" means work or
11 operations performed by you or on your behalf.  Now,
12 when the guys are leaving the job, are they performing
13 stuff for South Texas Masonry?  I don't think so.  Are
14 they leaving on behalf of South Texas Masonry?  I
15 don't think so.  Is it related to their work?  Yeah,
16 they've got to go home.
17    Q.  You would have no dispute with Texas case
18 law that says that in that type of circumstance, with
19 regard to interpretation of an insurance policy, they
20 would be considered to be within the work, in this
21 case, say, of the subcontractor?
22    A.  If that's what the -- if that's what the --
23 if the cases came out that way in the construction of
24 the definition of 22.A., and 22.A. is a very common
25 definition in -- in CGL policies.  So I mean, it

29 (Pages 110 to 113)

**Wright Watson & Associates, L.L.C.**
**(512) 474-4363**

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

118

1       It's an open question as to whether or
2  not Mr. Salazar, the decedent, and Mr. Corral and
3  Mr. Gracia were considered to be doing the business of
4  their employer, South Texas Masonry, at the time of
5  the crane collapse?
6       A.  Well, the "were considered to be" is a
7  little different.  But I mean, that's asking, how did
8  those guys see the people who were working there.  I
9  mean, if the question is, is there -- is there a
10  question as to how a Texas court would see it, then,
11  yes.  Would -- is Hartford's interpretation of it
12  reasonable even if they are ultimately ruled against
13  by a Texas court.  Again, yes, if for no other reason
14  because of that "on behalf of" language.
15       Q.  Okay.  Why -- let's not talk about
16  extra-contractual situations.
17       A.  Okay.  Fair enough.
18       Q.  The contractual situation, you're open to --
19  to the possibility that there may be coverage, all
20  other things being applicable?
21       A.  Well, the -- if everything else -- if
22  everything else were the way you wanted it to be, it
23  is possible that a Texas court could say, without
24  being absurdly irrational, that while a guy is working
25  off a job site, if he is still on the job site, he

119

1  is -- he is still at work.
2       Q.  Okay.
3       A.  He is still at work -- he is clearly still
4  at work in the sense of premises, but he is still
5  somehow working.  I mean, that -- that strikes me as
6  implausible, but if the courts want to go the other
7  way, I could understand it.
8       Q.  All right.  Let's look at your report again.
9  Item four on page 14.  Suppose none of A.1 to A.3
10  applies.  The Hartford Lloyds Insurance policy is
11  triggered only if Peacock becomes legally obligated to
12  pay damages.  If I have understood the settlement,
13  release, and assignment agreements, that never
14  happened.  Other insurers paid on Peacock's behalf
15  before it was ever adjudged to have been negligently
16  injurious (and so forth) and hence before it ever
17  became legally obligated to pay damages.  As I
18  understand it, Peacock can not now acquire any legal
19  obligation to pay the plaintiffs in the underlying
20  case for what happened on October 23, 2000.  Hence the
21  insuring agreement can never be triggered.  If it
22  cannot be triggered, then Hartford Lloyds Insurance
23  can never owe Peacock under the policy.  Also, as I
24  understand it, Peacock did not pay.  Other insurers
25  did.  They are not now, apparently, seeking

120

1  subrogation, although perhaps Peacock is seeking to
2  enforce its liability insurers' subrogation rights
3  which it acquired by assignment, something which is
4  probably an absurd idea.
5       Let me see if I understand what you're
6  talking about in this paragraph, number four.  You're
7  saying that assuming that there was coverage for
8  Peacock because it qualified as an additional named
9  insured, and assuming that the injured parties of the
10  decedent, Mr. Salazar, were considered to be doing the
11  work for South Texas Masonry at the time of the crane
12  collapse, and assuming that the indemnification
13  provision of the subcontract agreement is valid under
14  Texas law, that none of that matters because there was
15  a settlement of the underlying litigation and,
16  therefore, Peacock never became legally obligated to
17  pay damages.  Is that what you're saying?
18       A.  Yes.  If I've understood what you have said,
19  yes.
20       Q.  So essentially, what you're saying is that
21  there can never be a cause of action for
22  indemnification where there has been a settlement of
23  the underlying litigation?
24       A.  Well, there could be.  And now,
25  indemnification here is -- we're talking about a claim

121

1  under an insurance policy, aren't we?
2       Q.  Sure.
3       A.  I mean, this isn't indemnification actually,
4  but -- so if -- I mean, if the -- there are two
5  situations that matter here.  One would be where the
6  carrier had agreed that there was coverage or was
7  defending, or something like this, and the insured
8  settled, as it were, out from under him.  The other
9  one is where the carrier has denied coverage and
10  the -- and the insured settles the case.  There can be
11  circumstances under a case like that where the insured
12  would owe the money anyway, though not as a rule.
13  The -- usually that requires a -- an adjudication of
14  liability, a contested adjudication of liability.
15       Now, here is the situation is that
16  Peacock's own insurer paid the tab.  Okay?  So that
17  Peacock -- so that the insurer would be subrogated to
18  the rights of Peacock, to the extent that Peacock has
19  them, precisely because that insurer paid the bill.
20       Now, the question would be whether
21  the -- whether the settlement, whether the events
22  leading up to the settlement and the settlement itself
23  are the sort of things which Texas -- Texas courts
24  would recognize as the kinds of things which triggered
25  an obligation to pay on the part of an insurer like

31 (Pages 118 to 121)

Peacock Construction, et al v.                                    Michael Sean Quinn
McQueary Henry Bowles, et al                                      March 11, 2005

126

1    Q.  Oh, I'm not talking about a setup.  I'm
2    talking about a situation where liability is clear,
3    and an insurer -- or a presumed insurer denies
4    coverage, and there is a settlement, and that even
5    though the liability might be clear, that they say,
6    uh-huh, you're -- the obligation to pay damages has
7    never been triggered because of this settlement?
8    A.  No.  In that case, it wouldn't work.  And
9    the reason it wouldn't work is because the -- the --
10   the insurance company, because of its breach of the
11   contract, would not be able to raise the issue of --
12   of legal liability.  It breached the contract first by
13   denying coverage.
14   Q.  And in this case, Hartford Lloyds Insurance
15   Company denied coverage before the settlement was
16   entered into between Peacock and the original
17   plaintiffs?
18   A.  That's my understanding.
19   Q.  Okay.
20   A.  I don't know that to be true, by the way.
21   Oh, I'm sorry.  Yes.  The -- Nancy's letter.  If you
22   consider -- I think it would be reasonable to say --
23   and given the August follow-up, constituted a denial,
24   yeah.  Plus an invitation to come on back if you've
25   got anything more.

127

1    Q.  But there is at least three letters from
2    Ms. Kaechler where coverage has been denied and there
3    is no question about it?
4    A.  Yeah.  I call her Nancy only -- I don't know
5    her.  I call her that only because I can't remember
6    how to pronounce Kaechler.
7    Q.  Okay.  That's --
8    A.  You have a wonderful pronunciation.  I
9    admire it greatly.
10   Q.  Thank you.
11       Just another question about this
12   paragraph four.  You say -- and I think you're talking
13   about Peacock's insurers other than the presumed
14   insurer, Hartford Lloyds Insurance Company.  You said,
15   they are not now apparently seeking subrogation,
16   although perhaps Peacock is seeking to enforce its
17   liability insurance subrogation -- subrogation rights
18   which it acquired by assignment, something which is
19   probably an absurd idea, the last paragraph.
20       On what basis do you understand that --
21   or do you feel that Peacock's insurance companies are
22   not seeking equitable subrogation against Hartford
23   Lloyds?
24   A.  Looking at the settlement agreements, it
25   looked like to me that all rights had ended up in --

128

1    in Peacock's laps.  And it looked like to me, and I
2    can't remember it, but I thought that the agreement
3    said, to the extent we have any rights, you get them
4    back.  Now, if there had been no subrogation, I think
5    that would probably be fine.  But I mean, A is
6    subrogated to B and then B assigns it back to A.  I --
7    it just doesn't make any sense to me.
8    Q.  Is there a particular subrogation --
9    particular document you're thinking about?
10   A.  No.  I -- it's just, when I wrote this, it
11   was a -- it was my recollection that that was somehow
12   or another in the settlement agreements.  If it's not,
13   that sentence can be struck out and forgotten.
14   Q.  Okay.  Look at paragraph five.  It says,
15   significantly, the Hartford Lloyds Insurance policy,
16   by its terms, is excess with respect to Peacock if
17   Peacock had its own insurance.  I have not seen the
18   other policies, but if the Houston Lloyds -- I keep on
19   saying that -- Hartford Lloyds Insurance term is
20   enforced as against the assignees of the other
21   insurer's, then there is nothing to discuss.  Hartford
22   Lloyds cannot now owe anything.  See Common Policy
23   Conditions, Section I.
24       Let me see if I understand this
25   correctly.  You're saying that the Hartford Lloyds

129

1    policy is excess with regard to Peacock if Peacock had
2    its own insurance.  What terms of the Hartford Lloyds
3    policy are you talking about here?
4    A.  I'm talking about Common Policy Conditions,
5    Section I.  Either I have got to go find the common
6    policy conditions.  All right.  I mean, it's the first
7    page of the common -- of the common policy conditions.
8    It's towards the front of the document.
9    Q.  So it's page one of four.  Okay.
10   A.  And then you would go to Section I, which
11   would be on two of four, which says, Other Insurance,
12   Business Liability.
13   Q.  Well, go ahead and read that --
14   A.  Okay.  If other valid and collectable
15   insurance is available to the insured for a loss
16   recovered under business liability, our -- our
17   obligations are limited as follows.  Then it talks
18   about primary insurance and then it goes to B.  The
19   insurance is excess over any other insurance, whether
20   primary, excess, contingent, or any other basis.
21   Q.  Well, let's see if I understand it.  If --
22   are you done?
23   A.  No, I don't think so.
24       MR. CARRERA:  Frank, what was that?
25       MR. WEATHERED:  What?

33 (Pages 126 to 129)

Wright Watson & Associates, L.L.C.
(512) 474-4363

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

---

134

1  participated in mediation proceedings which ultimately
2  resulted in the settlement of the underlying case?
3      MR. BARKER: Objection. Form.
4      A. I am aware that something or another like
5  that happened. I mean, I'm not -- I don't know if --
6  if the Hartford people were there at the mediation. I
7  don't know what the participation of South Texas
8  Masonry amounted to, and it's certainly not true that
9  every mediation results in a -- in a reasonable
10 settlement.
11     MR. CARRERA: Mr. Barker, what is the
12 basis for your objection?
13     MR. BARKER: I think you've
14 mischaracterized the evidence. I think that you used
15 the term, participated in the mediation. I agree that
16 Mr. Dunn was there, but from everything that I've seen
17 in the way of reports from him, or reports to
18 Hartford, he was simply there and was not
19 participating, was not offering any money, and refused
20 on numerous occasions to join the mediation other than
21 simply to observe and to listen.
22     Q. (BY MR. CARRERA) Would the term, invited to
23 participate at the mediation be --
24     A. Well, I actually even knew that. I believe
25 I knew that they were -- that they were, in some

---

135

1  sense, invited or people asked them to come or the
2  were demanded to come or something like that and they
3  said they weren't going to come. I did know that.
4      Q. (BY MR. CARRERA) And by "them," you're
5  talking about Hartford Lloyds?
6      A. Yes.
7      Q. Okay. Mr. Barker has, on occasion, advised
8  me that under the terms of the Hartford Lloyds
9  Insurance Company, that even if Peacock was an
10 additional insured or qualified as an additional
11 insured, they could only obtain the same coverage that
12 South Texas Masonry had. And that because the injured
13 parties and the beneficiaries of the decedent would be
14 barred under the Texas Workers' Compensation laws from
15 making a claim of South Texas Masonry, that the policy
16 could not provide coverage to Peacock for injuries to
17 those individuals. I think I have kind of phrased
18 that correctly.
19     MR. BARKER: True, but you have to
20 understand, I'm not an expert either.
21     MR. CARRERA: Okay. I will stipulate
22 to that, Counsel.
23     Q. (BY MR. CARRERA) And my question to you is
24 this. Do you have an opinion as to whether or not the
25 fact that the injured parties could not make a

---

136

1  claim -- a direct claim against South Texas Masonry,
2  whether that would bar coverage under this policy to
3  Peacock Construction Company for injuries to South
4  Texas employees?
5      A. To tell you the truth, I hadn't thought
6  about it.
7      Q. You had not thought about it?
8      A. No.
9      Q. Okay.
10     A. What I've done -- and while you were
11 talking, I went to page four of 21 of the -- of the
12 liability part of the policy, to the exclusions. And
13 it says here that employer's liability -- now, that's
14 the title of it, so it doesn't mean much. That's --
15     Q. Okay.
16     A. So you begin, this insurance does not apply
17 to bodily injury to an employee of the insured arising
18 out of employment by the insured, Okay.
19     Q. To some extent we may be talking about
20 subparagraph D that is slightly above that.
21     A. Well, let me get to --
22     Q. Workers' compensation, similar laws.
23     A. Let me get to the --
24     Q. Okay. Okay. Go ahead.
25     A. And this says, bodily injury to an employee

---

137

1  of the insured arising out or in the course of
2  employment by the insured. Now, if you go back to
3  page one of 21, the word "insured" is defined as any
4  person or organization qualifying as such under
5  section C, who is an insured. And section C says that
6  South Texas Masonry is an insured. Now, a
7  straightforward application of the words of the policy
8  tends to support Barker's view. In fact, it clearly
9  supports it. Now, I know of no cases which say that
10 this -- this is in any way changed by the additional
11 insured portion of it. On the other hand, I haven't
12 read that entire portion of it with this problem in
13 mind, so I don't have an opinion. I'm just kind of
14 introducing you.
15     Q. Well, okay.
16     A. Now, the other one -- well, the one you
17 brought to my attention would be D. This insurance
18 does not apply to any obligation of the insured --
19 again, that would be South Texas -- under a workers'
20 compensation disability or -- or unemployment
21 compensation law. All right. Yeah. Well, that
22 clearly would apply only to what South Texas Masonry
23 might owe through -- or which the workers'
24 compensation policy might be obligated to pay, so the
25 workers' compensation policy wouldn't -- you wouldn't

35 (Pages 134 to 137)

142

1  contract. The -- there is also a problem, it seems to
2  me that the -- under Texas law, there is liability for
3  negligence under most circumstances only if there is
4  physical -- physical injury. And so as a -- as a tort
5  theory, negligence doesn't fit here, because although
6  these men were badly injured physically, it wasn't by
7  Hartford.
8     Q.  Okay. I think I understand what you're
9  saying. Is that there is -- let me back up.
10          Are you saying there is no negligence
11  cause of action possible against Hartford, because it
12  is not a direct tortfeasor?
13    A.  As far as physical injury is concerned,
14  yeah. I mean, now, there are some exceptions to this
15  in the area of professional malpractice, but nobody
16  knows -- nobody knows yet how far that's going to
17  spread. And the Supreme Court has been perfectly
18  clear that it doesn't want to classify common law bad
19  faith as a form of negligence.
20    Q.  And you feel that --
21    A.  Although I can't, myself, tell the
22  difference. Not really.
23    Q.  And you feel that Hartford Lloyds Insurance
24  Company has made no misrepresentations with regard to
25  any of the policy provisions of this case?

143

1     A.  Well, I say -- you know, there is a
2  theoretical problem here, because if I say -- if I say
3  to you, you're not covered because this is the way the
4  policy reads, and I turn out to be wrong in my
5  interpretation of the policy, you as the plaintiff's
6  lawyer here should take the position, well, your
7  interpretation of the policy constitutes a
8  misrepresentation. But it seems to me the way that
9  that usually goes and the way it should go, is this:
10  If I correctly tell you what the policy says, that's
11  why you quote them in coverage denial letters, this is
12  what the policy says, and given what else has
13  happened, here is how I interpret it, there is no
14  misrepresentation, unless you're lying about how you
15  interpret it. And I don't see any evidence of that
16  here.
17    Q.  Okay. And you feel that based on Hartford
18  Lloyds Insurance Company's interpretation of the
19  policy, that you did not fail to attempt in good faith
20  to effectuate a prompt, fair and equitable settlement
21  to the claim?
22    A.  Yes, I do think that. Why? Because --
23  because they were proceeding fairly even if they were
24  wrong. And I don't think they're wrong, but if they
25  are, they weren't being -- they weren't, you know,

144

1  being -- well, as many people are described on the
2  show Deadwood.
3     Q.  Okay. I don't watch that, but I'll take
4  your word for it.
5        MR. WEATHERED:  I'm sorry. I missed
6  that.
7        MR. CARRERA:  He said that -- he was
8  describing the show Deadwood, which I -- I've glanced
9  through the TV and seen it, but I've never watched --
10  watched a full program.
11         THE WITNESS:  I said that even if
12  Hartford was wrong in denying the claim and in the
13  interpretation of the policy, it does not deserve to
14  be described as many people in Deadwood are described.
15         MR. WEATHERED:  Okay.
16    Q.  (BY MR. CARRERA)  And you feel that Hartford
17  Lloyds Insurance Company was timely in its
18  communications with Peacock or its attorneys with
19  regard to this issue?
20    A.  Yes. And even if it wasn't, I don't see any
21  damages because the -- because the -- you know, the
22  other insurance company stepped up to the plate.
23    Q.  What is the distinction to -- to you between
24  common law bad faith and Texas Insurance Code
25  violations constituting bad faith?

145

1     A.  Well, I mean, the -- the Supreme Court has
2  laid out a criteria for common law bad faith. 2121
3  has laid out, you know, prompt fair and equitable.
4  The -- consequently, the jury issues are somewhat
5  differently worded. Does the same evidence tend to
6  support in the same direction? Yeah, I think so.
7  I'm -- now, what can I say after that? I mean,
8  prompt, fair and equitable doesn't appear in the -- in
9  the traditional common law bad faith definitions for
10  jury issues.
11    Q.  Let's look at page 18 of your report,
12  subparagraph E, it's called Insured's Duties,  It
13  says, given the material provided me, I have concluded
14  that Peacock did not comply with significant
15  provisions of the Hartford Lloyds Insurance-South
16  Texas Masonry insurance contract. These provisions
17  are well known, at least in standard terms, across the
18  board in primary liability contracts.
19         What are you talking about here?  What
20  did -- what did Peacock fail to do?
21    A.  It -- it failed to keep Hartford up on what
22  was going on in the underlying lawsuit.
23    Q.  Have you reviewed -- or have you had an
24  opportunity to review the --
25    A.  Yes.

37 (Pages 142 to 145)

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

150

1   that nature? That's --
2       A.  Yes.
3       Q.  Okay.  And so it's -- and you're saying
4   that, in your opinion, Peacock violated E.2.b.c. --
5       A.  And through four.
6       Q.  Well, is it B and C?
7       A.  Yes.  It says -- I've written it b.c., but I
8   can, now looking at it, see that that's not a very
9   good way to do it.  But c is the one that I have in
10  mind.
11      Q.  Was there a violation of E.b.?  E.2.b.?
12      A.  I'm not sure I even know.  If a claim is
13  made or a suit is brought against any insured, you
14  must -- "you" is the named insured, so it would be --
15  it would be South Texas Masonry.  If a suit is brought
16  against any insured, you must immediately record the
17  specifics of the claim or suit and the date received
18  and notify us as soon as possible.  You must see to it
19  that we receive a written notice of the claim or suit
20  as soon as practicable.
21          So these are the obligations of -- of
22  South Texas.
23      Q.  Now, assuming South Texas met these
24  obligations, would that constitute sufficient notice
25  to Hartford Lloyds Insurance Company of the same

151

1   information that you're claiming Peacock didn't supply
2   in this case?
3       A.  Well, it wouldn't constitute a claim.  It
4   would probably be -- it would be sufficient to prevent
5   a violation of b.
6       Q.  In any event, Ms. -- shortly after the
7   lawsuit was filed --
8           (Deposition Exhibit No. 14
9           (marked for identification.
10      Q.  (BY MR. CARRERA) -- one of Peacock's
11  insurers, First American Insurance Company, notified
12  South Texas Masonry about the underlying litigation
13  and that, in First Mercury's opinion, that there would
14  be coverage under the Hartford Lloyd policy.
15          MR. WEATHERED:  What are you reading
16  from, Victor?
17          MR. CARRERA:  This is a letter dated
18  January 28, 2003, from Christopher Golles,
19  G-o-l-l-e-s, of First Mercury Insurance Company, to
20  South Texas Masonry.
21      Q.  (BY MR. CARRERA)  Have you ever seen that
22  document before, sir?
23      A.  I can't remember.  I'm sure I have, because
24  it ended up in the claims file.
25      Q.  Okay.  So is this the type of information

152

1   that an insured, either South Texas Masonry or
2   Peacock, if it was claiming to be an insured, should
3   have provided to -- to Hartford Lloyds?
4       A.  Yes.  I mean, I don't think you would have
5   to send them a copy of it, but you need to tell them
6   it's out there.  The easiest way you do that is send
7   them a copy of it.
8       Q.  Have you ever heard of U.S. Risk, in Austin?
9       A.  If I have, I don't remember.
10      Q.  Okay.  Do you have any thoughts as to how a
11  fax of -- or why a fax copy of the insurance
12  certificate we've been talking about as
13  Exhibit -- hold on -- 9 to your deposition --
14      A.  No.
15      Q.  -- would be found in the Hartford Lloyds
16  claims file?
17      A.  I haven't a clue.
18      Q.  With an e-mail -- excuse me.  A fax date of
19  October 24th of 2002, which would be one day after
20  this accident?
21      A.  I haven't a clue.
22      Q.  Okay.  In any event, the intent of these
23  provisions you're referencing in your report is to
24  make sure that the insurer, in this case, Hartford
25  Lloyds, is being kept apprised of -- provided with

153

1   notice of the litigation, and that the insured will
2   cooperate, obtain records, et cetera, et cetera?
3       A.  That's the function of little c, yeah.  b
4   has much more to do with initial notice.  b has to do
5   with -- c has to do with ongoing problems.
6       Q.  So as far -- so as far as initial notice, we
7   know that there is -- strike that.
8           (Deposition Exhibit No. 15
9           (marked for identification.
10      Q.  (BY MR. CARRERA)  Exhibit 15 is a fax
11  transmission dated February 11, 2003, from a Christy
12  Lee of McQueary, Henry, Bowles & Troy to
13  Hartford Insurance Company.  Have you seen that
14  document?
15      A.  Yes.
16      Q.  So I think it's clear from the documentation
17  that within at least two to three months, at the
18  latest, from the date of the crane collapse that
19  Hartford Lloyds Insurance Company was at least aware
20  of this litigation.
21      A.  Yes.  Three months is a long time.
22      Q.  Well, if we look at --
23      A.  By -- by the way, I -- when I first saw
24  this, I thought this was very odd.  Your insured is
25  South Texas Masonry, the claimant is Peacock

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

158

1  feel that the policy should be reformed to allow that?
2      **A.  Well, the intent would have to be of -- of**
3  **Hartford as well as that of -- as well as that of**
4  **Peacock and -- and from the point of view of the -- of**
5  **the lawsuits as it exists now, what South Texas**
6  **Masonry intended is irrelevant, because the only**
7  **parties here are Peacock and Hartford. And I didn't**
8  **see any evidence that Hartford ever explicitly**
9  **intended to include Peacock, in which case,**
10 **reformation should fail.**
11     Q.  So --
12     **A.  As between those two.**
13     Q.  So what you're saying is that Hartford
14 Lloyds Insurance Company, because it was not party to
15 the subcontract agreement between South Texas Masonry
16 and Peacock --
17     **A.  Right.**
18     Q.  -- has not made any type of mutual mistake
19 which would call for an equitable reformation of the
20 contract?
21     **A.  Yes, that's right. Now, here is an**
22 **interesting question that I've been wondering about**
23 **for -- ever since I started in this thing. Let us**
24 **suppose that Peacock and South Texas get into a --**
25 **there is a contested case, and they end up with a --**

159

1  **with contract reformation. All right? And it's**
2  **reformed in the year -- you know, towards the end of**
3  **2005. What would be the effect of this reformation on**
4  **the contract issued in -- for 2001 and two as between**
5  **Hartford and anybody? I have no idea. I mean, I**
6  **don't know what the answer is.**
7      Q.  Let's conclude your --
8      **A.  Nice question, though, don't you think?**
9          MR. BARKER:  I would think none, since
10 the actions have already gone forward --
11         THE WITNESS:  You would think so. I
12 would think so. I mean, that's my in instinct, but I
13 don't really know.
14     Q.  (BY MR. CARRERA)  Let's look at the last
15 paragraph in your report, K. It says, Intermediary,
16 which you've identified as McQueary, Henry, Bowles &
17 Troy, Certificate of Insurance. And I'll read that in
18 its entirety. When the intermediary issued a
19 certificate of insurance, I have seen nothing to
20 suggest that it was the agent of Hartford Lloyds, that
21 it was authorized to do what it did, or that the
22 designation of Hartford Casualty Insurance Company
23 should be ignored, even though it is an error. I have
24 already suggested that the certificate contains a
25 significant error which is often understood in the

160

1  industry to stand in the way of coverage. More
2  significantly the language on the certificate itself
3  does not empower it to create coverage if it does not
4  exist under the policy together with documents it
5  authorizes as authoritative. In fact, the language of
6  the certificate blocks any such creation. And then
7  you cite a case called Martin versus Wetzel County
8  Board of Education. And also you say, see Richard
9  Glucksman, an article that he wrote.
10         Now, did I read that correctly?
11     **A.  I think so.**
12     Q.  Let's me see if I understand what you're
13 saying is that -- and I think earlier you said that
14 the -- the certificate of insurance, Exhibit 9 to your
15 deposition, that it doesn't matter that Hartford
16 Casualty is listed rather than Hartford Lloyds as the
17 insurer, that more importantly, the certificate can
18 confer no rights because of the exculpatory language
19 in the upper right-hand corner?
20     **A.  Well, what I said was is that -- is that if**
21 **you ignored the fact that it -- that it says Hartford**
22 **Casualty. Right?**
23     Q.  Uh-huh.
24     **A.  And -- and said, let's treat it as though**
25 **Hartford Lloyds is the named insurer, it wouldn't**

161

1  matter. It wouldn't create coverage if there wasn't
2  any in the -- in the insurance contract.
3      Q.  Okay. Now, what is your understanding of
4  McQueary, Henry -- McQueary, Henry, Bowles & Troy's
5  position in this case, as say, a recording agent for
6  the Hartford companies, or is it not?
7      **A.  I don't know, so...**
8      Q.  Have you ever had any dealings with
9  McQueary, Henry, Bowles & Troy before?
10     **A.  Never.**
11     Q.  And so you don't know what its agency status
12 is, if any, in relation to Hartford Lloyds Insurance
13 Company?
14     **A.  That's correct.**
15     Q.  Or to the Hartford companies in general?
16     **A.  That's correct. I -- looking at the**
17 **underwriting file, it doesn't appear to me that**
18 **they're a -- that they're a -- what you're calling a**
19 **recording agent. If I have -- if we're using that**
20 **phrase in the same way, it would be to have the**
21 **authority to issue policies. And, you know, in lots**
22 **of cases, the intermediary, whether an agent or a**
23 **broker or something else, has to get on the phone with**
24 **the underwriter to get permission to do it. And send**
25 **in -- send in a wire or an e-mail, these days, of the**

41 (Pages 158 to 161)

**Wright Watson & Associates, L.L.C.**
**(512) 474-4363**

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

---

**166**

1 But that kind of thing, clarity, for example, is often
2 nothing but a question of law for the Court.
3         MR. WEATHERED:  Those are all the
4 questions I have.  Thank you.
5         MR. RODRIGUEZ:  I have couple of
6 questions to ask.
7              EXAMINATION
8 QUESTIONS BY MR. RODRIGUEZ:
9     Q.  Hector Rodriguez here.  I -- I'm
10 representing McQueary, Henry, Bowles & Troy.  Do you
11 understand that?
12     A.  Yes.
13     Q.  Well, I looked at your report and if the --
14 is the information you have in your report with
15 regards to the intermediary, the certificate of
16 insurance?
17     A.  Yes.
18     Q.  Are these the only opinions you have with
19 regards to that particular issue?
20     A.  Yes.
21     Q.  Now, I -- in reading this, it seemed to me
22 that you don't -- am I correct that you don't have an
23 opinion with regards to my client's conduct in this
24 case, but your opinions are -- are strictly based on
25 whether or not this particular certificate of

---

**167**

1 insurance actually creates a duty on the part of -- of
2 Hartford.  Is that correct?
3     A.  I think that would be right.  I mean...
4     Q.  Well, let me see if I can put it a different
5 way for you.
6         You don't have an opinion with regards
7 to the conduct of my client in this case, do you?
8     A.  Well, I mean, the truth of the matter is
9 that I do.  They made a mistake.  I mean, I -- it
10 doesn't seem to me to be a big mistake, but they did
11 make a mistake.  I mean, now, if that's what you're
12 asking me, do I believe they made a mistake, yes.
13     Q.  Well, what is the mistake you believe they
14 made?
15     A.  They send out a certificate of insurance
16 with the name Hartford -- Hartford Casualty on it
17 instead of the name Hartford Lloyds.  That's all.
18     Q.  And is that the extent of your opinion?
19     A.  I think so.
20         MR. RODRIGUEZ:  All right.  Thank you.
21 No further questions.
22         MR. CARRERA:  Mr. Quinn, we're done.
23 Thank you very much.
24         THE WITNESS:  All right.  Well, it's
25 been a pleasure --

---

**168**

1         MR. BARKER:  I'll save mine 'til the
2 time of trial.
3         MR. CARRERA:  And for the record,
4 Exhibit 3, which is cases, I will take that with me,
5 make a copy of it, send it to -- the original back to
6 Mr. Quinn.
7         THE WITNESS:  Send it to him so he can
8 get a copy of it, too, if he wants to.
9         MR. CARRERA:  Well, I can make a copy
10 for him.
11         THE WITNESS:  Then just send the
12 original back to me and send him a copy.
13         MR. CARRERA:  And I will highlight
14 whatever is highlighted on there.  If you gentlemen
15 want a copy, let me know and I'll send them to you.
16         MR. WEATHERED:  Okay.  Thank you.
17
18
19
20
21
22
23
24
25

---

**169**

1              CHANGES AND SIGNATURE
2 Page/Line     Correction     Reason for Correction
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24     I, MICHAEL SEAN QUINN, have read the
25 foregoing deposition and hereby affix my signature

43 (Pages 166 to 169)

Peacock Construction, et al v.
McQueary Henry Bowles, et al

Michael Sean Quinn
March 11, 2005

174

```
 1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2
 3           The original deposition was/was not
 4    returned to the deposition officer;
 5           If returned, the attached Changes and
 6    Signature page contains any changes and the reasons
 7    therefor;
 8           If returned, the original deposition was
 9    delivered to MR. VICTOR M. CARRERA, Custodial
10    Attorney;
11           That $_____ is the deposition
12    officer's charges for preparing the original
13    deposition transcript and any copies of exhibits,
14    charged to PLAINTIFF;
15           That a copy of this certificate was served
16    on all parties shown herein and filed with the Clerk.
17           Certified to me this _____ day
18    of _____, _____.
19
20           BRENDA J. WRIGHT, Texas CSR No. 1780
             Expiration Date:  12-31-06
21           WRIGHT WATSON STEN-TEL
             Registration No. 225
22           Expiration Date:  12-31-05
             1801 N. Lamar Boulevard
23           Mezzanine Level
             Austin, Texas  78701
24           (512) 474-4363

25    JOB NO. 050311BJW
```

45 (Page 174)

**Wright Watson & Associates, L.L.C.**
**(512) 474-4363**